UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                            :

UNITED STATES OF AMERICA

                            :

        -v.-

                            :        22 Cr. 19 (PGG)

BRADLEY PIERRE *et al.*,

                            :

               Defendants.

                            :
---------------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO BRADLEY PIERRE AND WILLIAM WEINER'S PRETRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Mathew Andrews
Louis A. Pellegrino
Assistant United States Attorneys
    -Of Counsel-

i

# <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ......................................................................... 5

II.   BACKGROUND ............................................................................................... 5

III.  SUMMARY OF THE ARGUMENT .................................................................. 8

IV.   ARGUMENT.................................................................................................... 8

   I.    The Court Should Deny the Moving Defendants' Motion to "Partially Dismiss," or
Strike, Count One of the Indictment ................................................................... 8

     A.    Applicable Law ........................................................................................... 10

     B.    Background Regarding Fraudulent Incorporation and New York's No-Fault Laws.... 12

     C.    Relevant Facts ............................................................................................ 18

     D.    Discussion ................................................................................................... 19

     1.    The Moving Defendants' Challenge to the Mallela Fraudulent Incorporation Theory
in Count One Ignores Binding New York and Second Circuit Precedent ....................... 19

     2.    The Moving Defendants Cite No Cases on Point ................................................... 25

   II.   The Court Should Dismiss as Moot the Moving Defendants' Request to Sever their Trial
from Defendant Marvin Moy ............................................................................. 27

   III.  The Court Should Deny Weiner's Motion to Dismiss Counts One and Two of the
Indictment and Reject Weiner's Demand for a Bill of Particulars ........................... 28

     A.    Relevant Facts ............................................................................................ 28

     B.    Relevant Law .............................................................................................. 30

     1.    Sufficiency of the Indictment........................................................................ 30

     2.    Bill of Particulars ...................................................................................... 32

     C.    Discussion .................................................................................................. 34

     1.    Weiner's Challenge to the Sufficiency of the Indictment Is Meritless ..................... 34

     2.    The Court Should Deny Weiner's Demand for a Bill of Particulars ......................... 38

V.    CONCLUSION................................................................................................. 43

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273 (E.D.N.Y. 2013) ........................................ 16

*Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358 (E.D.N.Y. 2012) ............................................ 16

*Costello v. United States*, 350 U.S. 359 (1956). ..................................................................... 11

*Fischer v. United States*, 529 U.S. 667(2000) ......................................................................... 27

*Gov't Emps. Ins. Co. v. Ajudua*, No. 15-CV-5199 (MKB), 2018 WL 7252961 (E.D.N.Y. Dec. 18, 2018) ...................................................................................................................................... 16

*Gov't Emps. Ins. Co. v. Avanguard Med. Grp., PLLC*, 27 N.Y.3d 22 (2016) ............................ 26

*Hamling v. United States*, 418 U.S. 87 (1974). ............................................................. 11, 12, 31

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243 (E.D.N.Y. 2012)................. 16

*Neder v. United States*, 527 U.S. 1 (1999 ................................................................................. 27

*State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500 (2d Cir.) ................................... passim

*United States v. Aleynikov*, 676 F.3d 71(2d Cir. 2012 .............................................................. 12

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998 ........................................................ 31, 32

*United States v. Avenatti*, 432 F. Supp. 3d 354 (S.D.N.Y. 2020)............................................. 38

*United States v. Barret*, 824 F. Supp. 2d 419 (E.D.N.Y. 2011)......................................... 34, 40

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987 ................................................. 33, 34

*United States v. Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005)............................................... 32

*United States v. Cohen*, 518 F.2d 727 (2d Cir. 1975) ............................................................. 34

*United States v. Crember*, No. 12 Cr. 473 (KBF) (S.D.N.Y. Dec. 13, 2012)............................ 32

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012); ........................................... 31, 36, 37

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010)............................................ 33

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988......................................................... 33

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ............................................... 11, 12

*United States v. Dupre*, 462 F.3d 131  (2d Cir. 2006) ............................................................ 43

*United States v. Dupree*, No. 10-CR-627 (KAM), 2011 WL 5976006 (E.D.N.Y. Nov. 29, 2011) ................................................................................................................................................. 34

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987)................................................... 34

*United States v. Frank,* 156 F.3d 332 (2d Cir.1998)............................................................... 42

*United States v. Gabinskaya*, 829 F.3d 127 (2d Cir. 2016). ............................................. 18, 25

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001)............................................. 33

*United States v. Gotti*, No. S4 02 CR 743(RCC), 2004 WL 32858 (S.D.N.Y. Jan. 6, 2004 ....... 33

*United States v. Heimann,* 705 F.2d 662 (2d Cir.1983).................................................... 42, 43

*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992), ..................................................... 12

*United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019)......................................................... 27

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002). .................................................. 32, 43

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ........................................... 33

*United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010))............................................................ 34

*United States v. McDermott*, 918 F.2d 319 (2d Cir. 1990). .................................................... 42

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001 ......................................... 34, 40

*United States v. Mucciante*, 21 F.3d 1228 (2d Cir.1994......................................................... 43

*United States v. Pagan*, 721 F.2d 24 (2d Cir. 1983)........................................................ 31, 37

*United States v. Patino*, 962 F.2d 263 (2d Cir. 1992 ................................................................ 42
*United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 WL 993119 (S.D.N.Y. Apr. 1, 2022) ........ 12
*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000)............................................................ 37, 42
*United States v. Pirro*, 96 F. Supp. 2d 279 (S.D.N.Y. 1999)....................................................... 38
*United States v. Rajaratnam*, No. 09 Cr. 1184(RJH), 2010 WL 2788168(S.D.N.Y. July 13, 2010). ............................................................................................................................. 34, 39
*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ............................................................. 32
*United States v. Rigas*, 490 F.3d 2080 (2d Cir. 2007) ..................................................... 37, 42, 43
*United States v. Rose*, No. 19 CR. 789 (PGG), 2021 WL 2117119 (S.D.N.Y. May 24, 2021).... 33
*United States v. Sabbeth*, 262 F.3d 207 (2d Cir. 2001); ............................................................. 32
*United States v. Salmonese,* 352 F.3d 608, 621 ........................................................................ 42
*United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980), ..................................................... 31, 37, 42
*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ...................................... 12, 32, 35, 37
*United States v. Strawberry*, 892 F. Supp. 519 (S.D.N.Y. 1995) ................................................ 33
*United States v. Stringer*, 730 F.3d 120, 125 (2d Cir. 2013) ..................................................... 31
*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990)................................................................ 34
*United States v. Tramunti*, 513 F.2d 1087 (2d Cir. 1975)). ...................................................... 31
*United States v. Valdez*, No. 1:20-CR-00115-ALC-3, 2021 WL 1317548 (S.D.N.Y. Apr. 9, 2021), .............................................................................................................................. 36
*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) .................................................................. 35
*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ...................................................... 31, 33, 42
*United States v. Wydermyer*, 51 F.3d 319 (2d Cir. 1995 ........................................................... 32
*United States v. Zarrab*, No. 15 CR 867(RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016).. 11
*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ............................... 17, 22, 23

**Statutes**

10 NYCRR 400.3 ................................................................................................................... 27
10 NYCRR 446 ...................................................................................................................... 27
11 N.Y.C.R.R. § 65-3.16(a)(12)). .................................................................................... 13, 15
18 U.S.C. § 3500 .............................................................................................................. 29, 43
42 CFR § 482.11 (1999) ........................................................................................................ 27
6531. N.Y. Business Corporation Law § 1507 ......................................................................... 14
N.Y. Ins. Law § 5102 ............................................................................................................. 21
N.Y. Ins. Law §§ 5101 ........................................................................................................... 13
New York Education Law §§ 6509 .......................................................................................... 14

**Rules**

Rule 7 of the Federal Rules of Criminal Procedure ...................................................... 12, 31, 32
Rule 12 of the Federal Rules of Criminal Procedure, ................................................................ 32
Rule 16 of the Federal Rules of Criminal Procedure ................................................................. 29

## PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum of Law in response to the pretrial motions (the "Motions") filed by defendants Bradley Pierre and William Weiner (collectively, the "Moving Defendants"). The Moving Defendants jointly seek: (1) to partially dismiss that theory of health care fraud in Count One of the Indictment that is based on alleged misrepresentations concerning the true ownership of the no-fault clinics, and/or to strike the allegations relating to the same; and (2) that defendant Marvin Moy be severed from their trial. Separately, Weiner alone seeks that the Court dismiss Counts One and Two of the Indictment or, in the alternative, issue a bill of particulars. Pierre does not join in Weiner's request. For the reasons that follow, the Motions should be denied in their entirety.

## BACKGROUND

The Court is well-versed in the record given the three years of motions, pleas, and sentencings. The instant prosecution arises out of a multi-year federal investigation into a widespread bribery, healthcare fraud, and money laundering scheme operating throughout the New York and New Jersey area. On November 6, 2019, a grand jury sitting in this district returned an indictment charging 27 defendants in connection with the scheme. *See United States v. Rose et al.*, 19 Cr. 789, Dkt. No. 1 (the "*Rose* Indictment"). As alleged, Rose and his co-conspirators paid hundreds of thousands of dollars to employees or agents of hospitals, medical service providers, police officers, and 911 operators employed by the New York Police Department ("NYPD"), and other entities (collectively, the "lead sources") for the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere. *Id.* ¶¶ 1, 8. Rose and his co-conspirators then contacted the victims and made false representations to steer the victims to receive medical treatment and consultation

from a select "network" of clinics and lawyers in New York, New Jersey, and elsewhere. *Id.* In reality, these clinics and lawyers were handpicked by Rose and his co-conspirators because the clinics and lawyers were paying illegal kickbacks to Rose and the co-conspirators in exchange for the referrals. *Id.* ¶ 3.

The *Rose* Indictment was not the end of the Government's investigation. The Government continued to investigate others involved in the conduct charged in the *Rose* Indictment—in particular, corrupt doctors, clinic owners, and attorneys who participated in the scheme. Approximately two years later, on or about January 11, 2022, the grand jury returned two additional indictments charging 13 individuals with, among other things, conspiracy to commit healthcare fraud, money laundering, and bribery, in *United States v. Gulkarov et al.*, 22 Cr. 20 (the "*Gulkarov* Indictment") and *United States v. Pierre et al.*, 22 Cr. 19 (the "*Pierre* Indictment").

Bradley Pierre and William Weiner are among those charged in the *Pierre* Indictment (collectively, the "*Pierre* Conspirators"). As alleged, the *Pierre* Conspirators participated in a criminal scheme to exploit insurance programs designed to protect motor vehicle accident victims (the "No-Fault Scheme"). *See Pierre* Indictment ¶ 1. Under New York law, every vehicle registered in New York State must have no-fault automobile insurance, which enables the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault (the "No-Fault Law"). ¶ 5. In order to be eligible for reimbursement under the No-Fault Law, however, all medical clinics in New York State must be incorporated, owned, operated, and/or controlled by a licensed medical practitioner. ¶ 6.

Bradley Pierre was the leader of the *Pierre* Conspirators. ¶ 7. In order to take advantage of the patient-friendly provisions of the No-Fault Law, Pierre recruited several medical

practitioners—including Weiner—to open various No-Fault Facilities between in or about 2008 up to and including 2021. ¶ 12. These Facilities fell into two groups: the No-Fault Clinics that conducted initial evaluations of patients and prescribed specialized care, and the MRI Facility that provided medical imaging services ("Nexray"). *Id.* Like the No-Fault Clinics, Nexray purported to be operated and controlled by a licensed physician – Weiner. ¶ 17. In practice, however, Weiner was a captive doctor. Pierre received the majority of Nexray's proceeds; Pierre controlled Nexray's bank accounts; he influenced the hiring and firing of Nexray's employees; he identified the locations for Nexray's facilities; he negotiated the rent for Nexray's leases; and he alone chose the attorneys that would represent Nexray in arbitration, litigation, and sworn depositions before insurance companies. *Id.* Pierre further arranged for a network of no-fault doctors and attorneys to refer patients to Nexray for medical care—oftentimes through bribery—in addition to the No-Fault Clinics under his control. *Id.* In order to boost these referrals, Weiner agreed with Pierre to falsify clinical findings of injuries on MRI reports and pressure radiologists working for Nexray to exaggerate findings of injuries in their own reports. ¶ 18. These false clinical findings, in turn, allowed referring physicians and attorneys to bill for additional benefits under the No-Fault Law and obtain larger legal settlements and judgments. *Id.*

Pierre directed Weiner to lie under oath to insurance companies to conceal the healthcare fraud scheme. ¶ 19. Under the No-Fault Law, insurance carriers have the right to subject medical providers to Examinations under Oath ("EUOs") when they suspect that providers have submitted fraudulent claims. *Id.* During the process, the physician is placed under oath and asked questions relevant to the claim at hand, including whether the medical practice is under the control of non-physicians. *Id.* Pierre and Weiner were aware that insurance companies would deny reimbursement for Nexray if Weiner testified truthfully about the medical necessity of treatments and Pierre's

control of the facility. *Id.* Pierre accordingly directed Weiner to falsely state under oath, among other things, that Pierre was solely a lender for Nexray and Pierre played no role in referring patients to Nexray. *Id.*

## SUMMARY OF THE ARGUMENT

## ARGUMENT

I.      **The Court Should Deny the Moving Defendants' Motion to "Partially Dismiss," or Strike, Count One of the Indictment**

In Count One of the Indictment, the Government alleges, *inter alia*, that Bradley Pierre and his co-defendants fraudulently owned and controlled five medical professional corporations - including clinics and an MRI facility - by paying licensed medical professionals to use their licenses to incorporate the professional corporations.[1]  Pierre Indictment, ¶ 2.  With regard to the Moving Defendants, the Indictment alleges that Pierre was the leader and organizer of the Pierre Conspirators and the No-Fault Scheme.  *Id.,* ¶ 7.  Pierre – who was not a licensed medical practitioner – owned, operated, and controlled the No- Fault Facilities that engaged in the fraudulent billing for unnecessary and excessive medical treatment under the No- Fault Law, and falsified findings of clinical injury in MRIs.  *Id.*  Pierre further engaged in multiple types of money laundering to conceal the proceeds of the No-Fault Scheme and financed a widespread bribery and kickback scheme to bring patients into the Facilities.  *Id.*

Co-defendant Weiner was a licensed physician who ceded control of his medical practice to Pierre, engaged in unnecessary and excessive medical treatments, and falsified clinical findings of injury in reports.  Specifically, Weiner was a licensed doctor of osteopathy who

---

[1] For ease of reference, the Government refers to this theory in this brief as the "fraudulent incorporation" theory.

incorporated the MRI facility Nexray Medical Imaging PC ("Nexray" or the "MRI Facility").  *Id.* ¶ 8.  As part of this scheme, Weiner and Pierre conspired to falsify the clinical findings of injury in MRI reports that were submitted to insurance companies.  *Id.,* ¶ ¶ 8, 18.  Pierre and Weiner then further conspired to defraud the insurance companies by, among other things, lying to the insurance companies under oath for years in order to hide the illegal operation of the No-Fault clinics, including Nexray.

The Moving Defendants now argue that those years of lies and perjury were unnecessary because it is not illegal for a non-physician to own a medical practice—or for a licensed physician such as Weiner to be controlled by a non-physician.  In doing so, the Moving Defendants assert that non-physician ownership is not "essential" to the bargain between insurer and insured, and therefore the Moving Defendants were entitled to lie to insurance companies about the ownership and control of the No-Fault Clinics, including Nexray. *See e.g.,* Pierre Mot. at 13-14 ("the false representation alleged here—that only licensed health care professionals owned the no fault clinics—is not a sufficient basis to establish federal health care fraud because that misrepresentation is not even part of the bargain between the parties, and *certainly* does not go to the core of the bargain between the insurer and the insured.").

But as discussed below, New York and federal law squarely holds to the contrary. Indeed, because no case law supports the Moving Defendants' arguments on this issue, the Moving Defendants instead urge this Court to disregard controlling precedent by relying on factually unrelated cases that have little persuasive value, because they involve disputes dealing with misrepresentations by stationary salesmen, letter shop owners, and construction contractors,

among others.  Accordingly, the Court should deny the Moving Defendants' motion to partially dismiss or to strike portions of Count One as meritless.[2]

## A.  Applicable Law

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Zarrab*, No. 15 CR 867(RMB), 2016 WL 6820737, at *2 (S.D.N.Y. Oct. 17, 2016) (quoting *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)). Indeed, it is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

Under the Federal Rules of Criminal Procedure, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must include the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). In other words, "an indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). To

---

[2] The Moving Defendants have alternately styled their motion as a "partial motion to dismiss" Count One, or as motion to strike under Rule 7(d).  Pierre Mot. at 1 ("The defendants move to dismiss the theory of the health care fraud that is based on alleged misrepresentations concerning the true ownership of the no-fault clinics, and to strike the allegations relating to that theory."). However, what the Moving Defendant appear to be seeking is not to strike or partially dismiss the fraud charge in Count One, but rather, preclusion of a particular category of evidence that the Government will rely upon to *prove* that fraud offense at trial.  *See e.g.,* Pierre Mot. at 5 ("The government erroneously alleges that these false representations to insurers suffice to establish the intent to injure element of mail fraud [sic]").  To the extent that the Court construes the Moving Defendants' motion as a motion to strike or preclude evidence rather than as a motion to dismiss, such a motion should be swiftly rejected for all the same reasons and based on the same law set forth in the Government's opposition to the motion to dismiss herein.

state an offense, the Second Circuit has "often stated that an indictment need do little more than

to track the language of the statute charged and state the time and place (in approximate terms)

of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal

quotation marks omitted).

When considering whether a count states an offense, "all allegations in the indictment

[are taken] as true." *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012). Moreover, the

indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d

Cir. 1992), and "must be read to include facts which are necessarily implied by the specific

allegations made," *Stavroulakis*, 952 F.2d at 693 (internal quotation marks omitted). Ultimately,

an indictment "need not be perfect, and common sense and reason are more important than

technicalities." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001).

Accordingly, a "defendant faces a high standard in seeking to dismiss an indictment" for

failure to state an offense. *United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 WL 993119, at *3

(S.D.N.Y. Apr. 1, 2022) (internal quotation marks omitted). Where, as here, the charging

instrument meets the basic requirements, dismissal is an "extraordinary remedy reserved only for

extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*,

268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks omitted).[3]

---

[3] In seeking to partially dismiss Count One (and with regard to Weiner's motion to dismiss
Counts One and Two), the Moving Defendants do not argue—nor could they—that those counts
suffer from any pleading deficiency, nor that they fail in any way other than that articulated
above to meet the lenient standards for stating the offense of health care fraud or money
laundering. Indeed, both counts "track the language of the statute charged and state the time and
place (in approximate terms) of the alleged crime." *Stavroulakis,* 952 F.2d at 693. They "fairly
inform [the] defendant of the charge against which he must defend" and "enable him to plead an
acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at
117. And they both include "a plain, concise, and definite written statement of the essential facts
constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

### B. Background Regarding Fraudulent Incorporation and New York's No-Fault Laws

The relevant history of New York's No-Fault Regime—and the controlling case law interpreting the statute—is set forth at length in the Second Circuit and New York Court of Appeal's decisions in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 502 (2d Cir.), *certified question accepted*, 3 N.Y.3d 687, 818 N.E.2d 647 (2004), *and certified question answered sub nom. State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758 (2005). "In 1973, the New York State Legislature passed the precursor to today's Comprehensive Motor Vehicle Insurance Reparations Act, see N.Y. Ins. Law §§ 5101 et seq. (formerly N.Y. Ins. Law §§ 670 et seq.), supplanting the state's common law tort remedies for most injuries associated with automobile accidents with a no-fault insurance scheme." *Mallela*, 372 F.3d at 502. "The purpose of the Act was to create a simple, efficient system that would provide prompt compensation to accident victims without regard to fault, and in that way reduce costs for both courts and insureds." *Id.* "The Act permits injured parties to recover benefits from insurers for 'basic economic loss,' including medical expenses, that arise out of the use or operation of a covered motor vehicle." *Id.* (citing N.Y. Ins. Law § 5102). The Superintendent of Insurance promulgated regulations to implement this statute, the key regulation of which sets forth:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

*Id.* at 503 (quoting 11 N.Y.C.R.R. § 65-3.16(a)(12)). As such, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ

and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.  In contrast, unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services. *See* New York Education Law §§ 6509-a; 6531. N.Y. Business Corporation Law § 1507.

These regulations were the basis of the litigation in *Mallela*. There, State Farm Insurance Company filed a federal civil lawsuit alleging, among other things, that the defendant doctors committed fraud because their medical practices were fraudulently incorporated and illegally operated or controlled by non-physicians. *Mallela*, 372 F.3d at 502. The Second Circuit found that the "issue posed is clearly recurring, and appears to be one of great importance to the State of New York," because "[a]nswering it will require consideration of the important policy considerations that gave rise to the no-fault scheme itself." *Id.* at 507. As such, the Second Circuit certified the question to the New York Court of Appeals of whether violations of the above-described provisions permit insurance carriers to "withhold payment for medical services provided by fraudulently incorporated enterprises to which patients have assigned their claims." 4 N.Y.3d 313, 319 (2005).

The New York Court of Appeals accepted certification and answered in the affirmative— that insurance companies may withhold payment for medical services provided by fraudulently incorporated enterprises. *Id.* In doing so, the Court of Appeals made clear that the insurance companies did not allege that the services provided by the medical providers were unnecessary or improper. *Id.*  Instead, the insurance companies alleged that:

> [U]nlicensed defendants paid physicians to use their names on paperwork filed with the State to establish medical service corporations. Once the medical service corporations were established under the facially valid cover of the nominal physician-owners, the nonphysicians actually operated the companies. To maintain the appearance that the physicians owned the entities, the nonphysicians caused the corporations to hire management companies (owned by the nonphysicians), which billed the medical corporations inflated rates for routine services.

*Id*. at 319-20. As a result, "the actual profits did not go to the nominal owners but were channeled to the nonphysicians who owned the management companies." *Id*.

In response to the certified question, the Court of Appeals held in *Mallela* that insurance companies were entitled to deny reimbursement because "the defendant companies undisputedly fail[ed] to meet the applicable state licensing requirements, which prohibit nonphysicians from owning or controlling medical service corporations." *Id*. at 320-21. As the *Mallela* Court reasoned, the No-Fault Insurance regime, Insurance Law § 5102 *et seq.*, "requires no-fault carriers to reimburse patients (or, as in this case, their medical provider assignees) for 'basic economic loss.'" *Id.* at 320. "Interpreting the statute, the Superintendent of Insurance promulgated 11 NYCRR 65-3.16 (a) (12) (effective April 4, 2002) and excluded from the meaning of 'basic economic loss' payments made to unlicensed or fraudulently licensed providers, thus rendering them ineligible for reimbursement." *Id.* As such, fraudulently incorporated clinics may not receive reimbursement under the plain terms of the statute. *See id.* This rule is designed "to combat rapidly growing incidences of fraud in the no-fault regime, fraud that [the Superintendent] has identified as correlative with the corporate practice of medicine by nonphysicians." *Id.* at 323 n.2. Accordingly, "carriers may look beyond the face of

licensing documents to identify willful and material failure to abide by state and local law." *Id.* at 321.[4]

The Court of Appeals' decision in *Mallela* has been settled law for nearly 20 years. Indeed, insurance companies have since filed numerous federal wire fraud, mail fraud, and healthcare fraud charges against clinics using the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See, e.g. Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 295 (E.D.N.Y. 2013) ("*Mallela* stands for the proposition that an insurer may bring an action for fraud or unjust enrichment, based on fraudulent incorporation, to recover payments made to fraudulently incorporated providers"); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 276 (E.D.N.Y. 2012) (holding same); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 369 (E.D.N.Y. 2012) (holding same); *Gov't Emps. Ins. Co. v. Ajudua*, No. 15-CV-5199 (MKB), 2018 WL 7252961, at *6 (E.D.N.Y. Dec. 18, 2018), *report and recommendation adopted sub nom. Gov't Emps. Ins. Co. v. Lurie*, No. 15CV05199MKBRLM, 2019 WL 276201 (E.D.N.Y. Jan. 22, 2019) (holding same).

Courts have further relied on *Mallela*'s reasoning in multiple cases involving criminal wire fraud, mail fraud, and healthcare fraud charges. For instance, Judge Oetken applied the *Mallela* principles in *Zemlyansky*, a 2013 Southern District of New York criminal case in which

---

[4] Thus, the New York Court of Appeals has made clear that the key question under *Mallela* is whether non-physicians are the "de facto owners of or exercised substantial control" over a medical practice. *See Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 406 (2019). Further, there is no requirement that non-physicians exercise *complete* control over clinics—only that they exercise *substantial* control. This rule reflects the "need to ensure that providers of professional services are not unduly influenced by unlicensed third parties who are free of professional responsibility requirements and may disregard patient care in operating a 'corporation . . . organized simply to make money.'" *Id.* at 404. The rule further is violated, for example, where the alleged owners of clinics engage in "funneling of profits to nonphysicians who owned companies that billed the professional corporation inflated rates." *Id.* at 406.

multiple defendant doctors were charged with fraudulent incorporation, where they incorporated a medical clinic and saw patients but were paid a flat percentage or salary by the non-physicians, and were instructed to follow set treatment protocols. *See United States v. Zemlyansky*, 945 F. Supp. 2d 438, 447 (S.D.N.Y. 2013). The defendants sought to dismiss the wire fraud charges against them because, in their view, the insurer suffered no injury. *Id.* at 448. In particular, the defendants asserted that "the insurer has an underlying obligation—unrelieved by Regulation 65–3.16(a)(12) or any other provision of New York Law—to make direct payment to the insured for treatment rendered by a licensed professional. When a patient assigns his or her claim to a fraudulently incorporated PC, Defendants argue, the PC's ineligibility to receive payment (by virtue of the regulation) results in a 'windfall' to the insurer, and '[w]indfalls are not injuries.'" *Id.* at 448. Judge Oetken denied the motion and found that this "argument lacks merit, most importantly because it fails to account adequately for the New York Court of Appeals' 2005 decision in *Mallela.*" *Id.* As Judge Oetken noted, "the Court of Appeals definitively held that, as a matter of New York law, fraudulently incorporated PCs 'are not entitled to reimbursement' by insurers." *Id.* (citing 4 N.Y.3d at 320). Accordingly, "irrespective of whether a *patient* would be entitled to reimbursement if he had *not* assigned his claim to a PC, it is clear (and has been clear since 2005) that where such an assignment has occurred, and where the PC is not owned by a licensed professional, an insurer has a *right* to refuse payment on the claim." *Id.* Judge Oetken further noted that the "fact that *Mallela* was a civil case is simply beside the point, as New York law, as construed by the New York Court of Appeals in *Mallela,* does not create the substantive federal offenses at issue." *Id.* "Rather, the Court here looks to New York law simply to determine whether a material misrepresentation has been made and whether it was made with the intent to defraud." *Id.* "On those issues, *Mallela* is crystal clear." *Id.*

16

Following Judge Oetken's decision on the *Zemlyansky* motion to dismiss, he conducted a two-week trial, after which physician Tatyana Gabinskaya and co-conspirator non-physicians, including Mikhail Zemlyansky, were convicted of health care and wire fraud charges. *See United States v. Gabinskaya,* 829 F.3d 127, 130 (2d Cir. 2016). Dr. Gabinskaya appealed her conviction on various grounds including insufficiency of evidence, and improper jury instructions, but her conviction was fully upheld on appeal. *Id.* In reviewing Dr. Gabinskaya's conviction, the Second Circuit expressly reaffirmed the New York Court of Appeals' *Mallela* principles set forth above, and rejected the very arguments that the Moving Defendants make here.

For example, it was alleged that Dr. Gabinskaya had signed incorporation paperwork forming the medical practice Clearview PC, and signed documents to open its bank accounts. *Gabinskaya,* 829 F.3d at 131. In actual fact, however, the evidence showed that Gabinskaya was merely a front whose medical license permitted Clearview to submit insurance claims. *Id.* The Second Circuit noted that it was Zemlyansky and Danilovich – who were not physicians – who controlled and operated the clinic, with no actual oversight by Gabinskaya, in such a way as to maximize the insurance payout from the statutory pool of no-fault automobile insurance. *Id.* The jury also heard that Dr. Gabinskaya had been required by Allstate Insurance to submit to EUOs regarding insurance claims which had been submitted by Clearview PC. *Id.* During the EUO, Gabinskaya lied that she had worked at Clearview "three hours per day," "two, three times a week" during which times she approved days off and conducted a "five, ten minute interview" of all new patients "to determine which MRI comes first." *Id.* The Second Circuit noted that this testimony was flatly contradicted by the testimony set forth by at least three Clearview employees and at least one clinic patient. *Id.*

### C.  Relevant Facts

As stated, as the mastermind of the scheme, non-physician Pierre illegally owned and controlled at least five medical clinics.  Indictment ¶¶ 2, 12.  Weiner, a physician, was recruited by Pierre to serve as a captive doctor at Nexray, one of the facilities controlled by Pierre.  Pierre profited by using his contacts in the "industry" to steer hundreds of patients from his other Clinics to Nexray.  *Id.* ¶ 17.  Nexray purported to be operated and controlled by physician Weiner, but in practice and reality, it was Pierre who controlled Nexray.  *Id.*  For example, Pierre received the majority of Nexray's proceeds; controlled Nexray's bank accounts; influenced the hiring and firing of Nexray's employees; identified the locations for Nexray's facilities; negotiated the rent for Nexray's leases; and chose the attorneys that would represent Nexray in arbitration, litigation, and sworn depositions before insurance companies.  *Id.*  Pierre further arranged for a network of other no-fault doctors and attorneys to refer patients to Nexray for medical care - oftentimes through bribery - in addition to the No-Fault Clinics under his control.  *Id.*

In order to boost referrals, Pierre and Weiner together agreed to falsify clinical findings of injuries on MRI reports, and to pressure radiologists working for Nexray to exaggerate findings of injuries in their own reports.  *Id.* ¶ 18.  These false clinical findings, in turn, allowed referring physicians and attorneys to bill for additional benefits under the No-Fault Law and obtain larger legal settlements and judgments.  *Id.*  Pierre further arranged for the No-Fault Physicians under his control, including Weiner and Marvin Moy, to lie under oath to insurance companies to conceal the healthcare fraud scheme.  *Id.* ¶ 19.

Pierre and the No-Fault Physicians, including Weiner, were aware that insurance companies would deny reimbursement for the No-Fault Facilities if the No-Fault Physicians

testified truthfully about the medical necessity of treatments and Pierre's control of the Facilities. *Id.* Pierre accordingly arranged for Weiner and others to falsely state under oath, among other things, that Pierre was solely a lender for the No-Fault Facilities and that Pierre "played no role" in referring patients to the No-Fault Facilities. *Id.*

As part of the scheme, Pierre also entered into purported "financing" arrangements with Weiner, Marvin Moy, and others. As part of these phony financing arrangements, Pierre purportedly gave loans to Weiner and Marvin Moy in return for a percentage of any money later paid by insurance companies. *Id.* ¶ 21. But in reality, Weiner and Moy paid Pierre in excess of $10 million of what Pierre was entitled to receive under these phony agreements. *Id.*

### D. Discussion

#### 1. The Moving Defendants' Challenge to the *Mallela* Fraudulent Incorporation Theory in Count One Ignores Binding New York and Second Circuit Precedent

The Moving Defendants cite a series of fraud cases for the proposition that in order to establish the intent to injure element of fraud, "it is necessary to identify the core economic exchange between the parties." Pierre Mot. at 11. The Moving Defendants then go on to conclude that the core economic exchange in the Government's health care fraud charge in Count One is lacking, because New York's requirement that only physicians may own and control medical clinics is not "essential" to the bargain between the insurer and the insured. *Id.* at 16.

The Moving Defendants misunderstand how the New York No-Fault regime functions. No-Fault benefits are not a creature of private contract. Instead, they are a state-imposed statutory regime "supplanting the state's common law tort remedies for most injuries associated with automobile accidents with a no-fault insurance scheme." *Mallela*, 372 F.3d at 502. As part

of this regime, injured parties may only "recover benefits from insurers for 'basic economic loss,' including medical expenses, that arise out of the use or operation of a covered motor vehicle." *Id.* (citing N.Y. Ins. Law § 5102).  The regime further permits the Superintendent of Insurance to pass regulations implementing the law.  *Id.*  In 2002, the Superintendent of Insurance promulgated 11 NYCRR 65–3.16(a) (12) and "excluded from the meaning of 'basic economic loss' payments made to unlicensed or fraudulently licensed providers, thus rendering them ineligible for reimbursement." *Mallela*, 4 N.Y.3d at 320. As such, New York state created a right (No-Fault benefits for "basic economic loss") and legally limited the scope of that right (by defining the scope of "basic economic loss").  This is the state's prerogative.  As the *Mallela* Court held, "[w]here, as here, the Superintendent has properly crafted a rule within the scope of his authority, that rule has the force of law and represents the policy choice of this State." *Id.* at 321. Accordingly, the "Superintendent's regulation allowing carriers to withhold reimbursement from fraudulently licensed medical corporations governs this case." *Id.*

The Moving Defendants respond by asserting *ipse dixit* that "New York State regulation making a layperson-owned medical corporation ineligible for payment of claims—even for legitimate and necessary treatments—is not part of the contract between the insurer and the insured individuals," but rather "exists independent of the agreement between the insurer and the insured." *See* Pierre Mot. at 12.  The Moving Defendants tellingly fail to discuss why this is the case (or mention *Mallela* or the history of the No-Fault regime).  The Moving Defendants also tellingly fail to describe the purported "contract" between the insurer and the insured that allegedly creates and defines insureds' No-Fault benefits.  The reason for this is that there is no such "contract."  No-Fault benefits are created by statute.  When an insured goes to a medical provider, the insured signs an assignment of benefit form (known as an "NF-3") transferring his

or her *statutory* rights to the provider.  The NF-3 form accordingly states in relevant part in capitalized, bolded letters, "**I HEREBY ASSIGN TO THE HEALTH CARE PROVIDER INDICATED BELOW ALL RIGHTS, PRIVILEGES AND REMEDIES TO PAYMENT FOR HEALTH CARE SERVICES PROVIDED BY THE ASSIGNEE <u>TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT STATUTE) OF THE INSURANCE LAW</u>** (emphasis added)."  An example NF-3 form is incorporated herein as <u>Exhibit A</u>. Accordingly, the entire basis of the Moving Defendants' theory—that No-Fault benefits are created and defined solely by contract—is mistaken.

The Moving Defendants' remaining arguments consist largely of strawman attacks on Judge Oetken's opinion in *Zemlyanksy* and the Second Circuit's decision in *Gabinskaya*—where this Circuit clearly held that *Mallela* authorizes federal criminal fraud charges based on false representations of physician ownership.  With regard to *Zemlyansky*, the Moving Defendants claim that Judge Oetken "did not perform an analysis of the core economic bargain between the contracting parties required by the Second Circuit in order to determine whether the false statement concerning ownership goes to the 'nature of the bargain itself' between the parties." Pierre Mot. at 16.  This position is meritless.  The *Zemlyansky* defendants made the same argument relying on the same case law as the Moving Defendants—namely, that "the Government's *Mallela* theory fails because the fraudulent inducement of a party to enter into a contract does not constitute criminal fraud" where "the bargained for services were properly provided; wherein there was no misrepresentation as to the nature or quality of the services provided; and the insurance companies were not injured through any alleged irrelevant deception as to who actually owned and controlled the medical P.C.s."  *See* Memorandum of Law in Support of the Defendant Boris Treysler's Pretrial Motions, *United States v. Zemlyansky et al.*,

Defendants, Boris Treysler, Moving Defendant., 2013 WL 8366074 (S.D.N.Y.).  In rejecting that

argument, Judge Oetken properly found that "the Court of Appeals definitively held that, as a

matter of New York law, fraudulently incorporated PCs 'are not entitled to reimbursement' by

insurers." *Zemlyansky*, 945 F. Supp. 2d at 448 (quoting *Mallela*, 4 N.Y.3d at 320).  The

"insurer's entitlement to withhold reimbursement in these circumstances is an interest in money

or property, the deprivation of which can be an injury under the fraud statutes." *Id.* at 448-49.[5]

    The Moving Defendants give equally short shrift to the Second Circuit's affirmance of

*Zemlyansky* in *Gabinskaya*.  The Moving Defendants assert only that *Gabinskaya* is irrelevant

because, in their view, the "defendant [there] did not raise the question as to whether false

representations about ownership were essential to the bargain between the insurer and insured,

and therefore sufficient to establish the scheme to defraud element of the federal fraud statutes at

issue."  Pierre Mot. at 14.  This is incorrect.

    *Gabinskaya* plainly set forth the controlling case law that applies the New York Court of

Appeal's *Mallella* principles of fraudulent incorporation into federal criminal fraud trials such as

this one.  Indeed, Dr. Gabinskaya challenged her conviction on *two* separate bases, thereby

---

[5] The Moving Defendants have not addressed *Mallela* in their briefing. However, the Court can easily reject any argument on reply that the New York Court of Appeals in *Mallela* somehow failed to consider their so-called analysis of the "core economic bargain." The New York Court of Appeals squarely addressed this issue because, as the Court of Appeals noted, "State Farm never alleged that the actual care received by patients was unnecessary or improper." 4 N.Y.3d at 320.  Instead, the "patients insured by State Farm presumably received appropriate care from a health professional qualified to give that care," and State Farm's complaint centered "on fraud in the corporate form rather than on the quality of care provided." *Id.*  In their briefing, the *Mallela* defendants repeatedly asserted that they should still receive payment under principles of contract law. *See* Brief of Certain Defendants-Appellees, *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 2003 WL 24174349 (C.A.2), 47-48 ("Even assuming that these allegations were false, there is no damage to State Farm since their insureds received quality medical treatment from licensed professionals. As such, equity and good conscience could not allow State Farm to avoid its contractual obligation to its insureds to pay on these claims."). The New York Court of Appeals nonetheless rejected these arguments for the reasons stated above.

providing the Court with multiple opportunities to determine whether *Mallela*-style fraudulent

incorporation allegations may form the basis of an essential element of a federal health care or

wire fraud charge.  In response to both points, the *Gabinskaya* court answered that question in

the affirmative.

For example, with regard to Dr. Gabinskaya's challenge to the sufficiency of the

evidence, the Second Circuit stated that:

> Gabinskaya does not argue that any of the individual factors the jury was instructed
> to consider, such as responsibility for the financial risk of the PC and domination
> and control over the PC, as well as various indicia of formal ownership, were
> improper, nor that any different or additional factors should have been included. . .
> Gabinskaya's argument is that the jury's consideration should have been limited
> solely to formal indicia of ownership. We reject that argument, and hold that, as in
> the civil context, a factfinder in a criminal case concerning no-fault insurance fraud
> in New York may consider factors beyond formal ownership in the context of
> fraudulent incorporation of a PC, which serves the State's interests both in
> preventing fraud and in preventing nonphysicians from practicing medicine.

*Gabinskaya,* 829 F.3d at 134.  Thus, the Second Circuit explicitly rejected the Moving

Defendants' contention that the *Mallela* rules apply only to civil cases.  *Cf.* Pierre Mot. at 13

("That insurers incidentally benefit from this prohibition, by gaining the right through civil

litigation to withhold payment from, or recover payments made to layperson owned medical

corporations, does not make that prohibition part of the economic exchange between the insurer

and the insured, in whose shoes the assignee medical corporation stands.").

Moreover, in upholding Dr. Gabinskaya's conviction on sufficiency grounds, the Second

Circuit also implicitly endorsed the notion that the *Mallela* principle of fraudulent incorporation

can form the basis for a federal health care fraud or wire fraud conviction.  Here, the Court

specifically noted that:

> The jury was entitled to conclude from Gabinskaya's false testimony during the
> EUO, along with the totality of the evidence, that Gabinskaya understood that, in
> order for Clearview lawfully to submit no-fault insurance claims, she, as a licensed

> physician, had to be not merely its paper owner but rather its actual owner, and that she knowingly participated in the fraudulent scheme with the intent to further its aims by misrepresenting her role at Clearview. Gabinskaya's challenge to the sufficiency of the evidence therefore fails.

*Gabinskaya*, 829 F.3d at 132.  These findings, standing alone, close the door on any argument that a fraudulent incorporation theory cannot form the basis of a federal health care fraud charge.

But the *Gabinskaya* court went further, also considering the New York Court of Appeals *Mallela* fraudulent incorporation theory in the context of Dr. Gabinskaya's challenge to the jury instructions issued by Judge Oetken.  There, Gabinskaya argued that the jury was improperly instructed on the definition of "ownership" in connection with the no-fault insurance system, alleging that "ownership" should have been defined "purely formally," without regard to the type of evidence that the Government will seek to introduce in this case regarding the Clinic Controllers' domination and control of the No-Fault Clinics.  *See id.*  In response, the Second Circuit again reiterated its fidelity to the New York Court of Appeals' *Mallela* principles, holding that:

> In order to be entitled to receive reimbursement from a no-fault insurer, a medical services PC must be owned by a licensed physician. *See* N.Y. Bus. Corp. Law § 1507(a); N.Y. Comp. Codes R. & Regs. tit. 11, § 65–3.16(a)(12). Under New York law, *such ownership has been authoritatively held to mean more than merely formal ownership of stock certificates*.

*Id.* at 133 (emphasis added).  Based on the foregoing, it is clear that the New York Court of Appeals and Second Circuit's decisions in *Mallela* and *Gabinskaya,* are binding precedent, and further, these cases leave no doubt that an individual can in fact be charged in a federal criminal fraud Indictment on the theory that that person participated in a conspiracy to fraudulently incorporate, or operate, a medical clinic.

24

### 2.   The Moving Defendants Cite No Cases on Point

None of the other cases that the Moving Defendants advance in support of their arguments are on point.  Indeed, because all of the *Mallela*-related federal precedent favors the Government's theory of Indictment, the Moving Defendants are unable to cite to a single case that has anything to do with New York's No-Fault automobile insurance regime.  *See e.g.,* Pierre Mot. at 11-12 (*Citing Regent Office Supply* ("money for stationary"); *Starr* ("money for mailing services"); *Davis* ("money for construction of steel decking"); *Paccione* ("money for proper disposal of medical waste"); *Frank* ("money for proper disposal of sewage"); *Shellef* ("money for an industrial solvent"); and *Novak* ("money for ability to hire non-Union labor, as per CBA").

Moreover, as they acknowledge, some of the cases that the Moving Defendants analyze actually support the Government's arguments.  *See e.g.,* Pierre Mot. at 8-10 (*citing United States v. Paccione* – court found requisite fraudulent intent with regard to specially licensed disposers of medical waste; *United States v. Frank* – court found requisite fraudulent intent with respect to offshore disposal of raw sewage; *United States v. Walker* – court found requisite fraudulent intent with regard to immigration lawyer's substantial fees for asylum applications).

No Court has accepted the Moving Defendants' theory that the *Mallela* fraudulent incorporation theory cannot form the basis for federal criminal charges, and this Court should not accept the defendant's invitation to be the first.  To hold otherwise would have serious societal consequences.  Accepting the Moving Defendants' theory would mean that violations of state and federal licensing requirements concerning the practice of medicine would not be criminal.  This would severely impact the state's ability to regulate the practice of medicine. *See, e.g.*, *Gov't Emps. Ins. Co. v. Avanguard Med. Grp., PLLC*, 27 N.Y.3d 22, 29–30 (2016) ("[H]ospitals and ASCs [ambulatory surgical centers] are regulated under Public Health Law

article 28, and are subject to strict standards under the Public Health Law and State Department

of Health Regulations that cover, inter alia, facility licensing and maintenance (*see* 10 NYCRR

part 446 [detailing the extensive reporting requirements], 10 NYCRR 400.3 [requiring

all hospitals and ASCs to maintain and, if required, reproduce any medical report or record] ).").

It would also impact the federal government's ability to police fraud in the practice of medicine

in connection with Medicare.  *See, e.g., Fischer v. United States*, 529 U.S. 667, 672 (2000)

("Providers of health care services, such as the two hospitals operated by WVHA, qualify to

participate in the program upon satisfying a comprehensive series of statutory and regulatory

requirements, including particular accreditation standards. Hospitals, for instance, must satisfy

licensing standards, 42 CFR § 482.11 (1999); possess a governing body to "ensure that there is

an effective, hospital-wide quality assurance program to evaluate the provision of patient care," §

482.21; and employ a "well organized" medical staff accountable on matters relating to "the

quality of the medical care provided to patients," § 482.22(b).").

Lastly, even if the Moving Defendants' theory regarding fraudulent incorporation were

correct—and it is not—the defendants' false statements about ownership and control are still

material because those lies were capable of influencing insurance companies' investigations into

unnecessary medical procedures being conducted at the Clinics.  *See United States v. Johnson*,

945 F.3d 606, 614 (2d Cir. 2019) ("A misrepresentation is material if it is capable 'of influencing

the intended victim.'" (quoting *Neder v. United States*, 527 U.S. 1, 24 (1999)).  The New York

Court of Appeals recognized in *Mallela* that the prohibition on non-physician ownership exists

"to combat rapidly growing incidences of fraud in the no-fault regime, fraud that [the

Superintendent of Insurance of the State of New York] has identified as correlative with the

corporate practice of medicine by nonphysicians."  4 N.Y.3d at 323 n.2.  The Moving

Defendants, in turn, are charged with causing unnecessary medical treatments to be conducted on patients by falsifying clinical findings and exaggerating findings of injury. *See e.g.,* Pierre Indictment ¶ 18. As such, the Moving Defendants' lies to insurance companies were capable of influencing the companies' investigations into the unnecessary medical treatments being conducted by the Clinics by concealing a key flag of fraud—namely, non-physician ownership. The false statements are accordingly material irrespective of whether non-physician ownership is an independent basis for non-payment of insurance claims.[6]

In sum, this Court should follow the Second Circuit's prior precedents in *Mallela* and *Gabinskaya,* and reject the Moving Defendants' motion to partially dismiss Count One of the Indictment.

## II.    The Court Should Dismiss as Moot the Moving Defendants' Request to Sever their Trial from Defendant Marvin Moy

As the Court is aware, on or about October 13, 2022, defendant Marvin Moy disappeared while offshore fishing approximately 16 nautical miles south of Shinnecock, New York. The Government continues to investigate the circumstances of Moy's disappearance, and at this time cannot definitely determine whether Moy was in fact killed in a collision alleged to have occurred between his fishing boat and a shipping vessel. The Government also has not fully ruled out the alternative possibility that Moy might be a fugitive. Accordingly, Moy is either

---

[6] These statements are also admissible as proof of the conspiracy, because they demonstrate that there was a meeting of the minds between the defendants about what lies should be told in response to the inquiring insurance companies. Indeed, the *Gabinskaya* court considered this precise issue on appeal, when Dr. Gabinskaya claimed that the evidence at trial was insufficient to prove that she had knowledge of the no-fault scheme. In rejecting this argument, the Second Circuit held that Dr. Gabinskaya did indeed have such knowledge, based on, among other things, the lies she had told in the EUOs regarding clinic ownership. *See Gabinskaya*, at 132 ("Gabinskaya's perjurious statements were all designed to [falsely] portray Gabinskaya as involved in or controlling Clearview's operations, as is necessary under New York State law.").

deceased, or is unlikely to be present for any trial of this matter.  Under either circumstance, the Government respectfully requests that the Court dismiss as moot the Moving Defendants' request to sever their trial from defendant Moy, without prejudice to seek leave to renew the motion if the situation should change.

### III. The Court Should Deny Weiner's Motion to Dismiss Counts One and Two of the Indictment and Reject Weiner's Demand for a Bill of Particulars

.

Weiner lastly seeks to dismiss Counts One and Two of the Indictment or, in the alternative, demands a bill of particulars. Notably, Weiner is the only defendant of the 13 individuals charged across the *Pierre* and *Gulkarov* cases to make such a motion. The other defendants have declined to do so for good reason. Weiner is charged in 21-page speaking indictment setting forth in detail the allegations against him and his co-conspirators. The Government has voluntarily made early disclosure of expert reports detailing how Weiner falsified clinical findings of injury in MRIs and statements of approximately 42 trial witnesses—years earlier than what is required by Rule 16 of the Federal Rules of Criminal Procedure or the *Jenks* Act (18 U.S.C. § 3500). In addition, the Government has conferred with Weiner's counsel extensively about the allegations in the Indictment during email, phone, and two in-person meetings. The Indictment, in combination with the Government's extensive voluntary disclosures and communications with counsel, go far beyond what is legally required under the Federal Rules of Criminal Procedure. The Court should accordingly deny Weiner's motion as meritless.

### A. Relevant Facts

In March 2022, two months after the *Pierre* and *Gulkarov* Indictments were filed, the Government voluntarily produced statements of approximately 34 trial witnesses. The same month, on or about March 25, 2022, the Government met with Weiner's counsel in person and

discussed the allegations against Weiner in length. The Government detailed the facts and evidence against Weiner, pointed counsel to portions of the discovery relevant to Weiner, and discussed several of the witnesses who would testify against Weiner at trial.

Approximately two weeks later, on or about April 13, 2022, the Government made early disclosure of expert testimony by Dr. Scott Coyne. Dr. Coyne's 24-page report detailed how Dr. Coyne randomly selected MRI reports prepared by Weiner for 40 different patients (the "Initial Report"). The Initial Report also detailed how Dr. Coyne found that Weiner's MRI reports either falsely reported patient injuries or failed to describe important underlying degenerative conditions as the cause of radiologic findings, which would mislead the referring physician to erroneously assume that the injuries were the result of trauma.

The same month, on or about April 27, 2022, Weiner's counsel sent a letter (the "April Letter") thanking the Government for "partial production of witnesses statements and reports" and for having "met with us to discuss discovery issues." The April Letter then made a host of additional inquiries regarding the Government's case. The Government responded on May 16, 2022, with additional information, including a non-exhaustive, two-page list of false statements that Weiner made during Examinations under Oath ("EUOs").

The next month, on or about June 20, 2022, the Government met with Weiner's counsel in person and again discussed the Government's case against Weiner at length. The Government afterwards voluntarily produced statements of another eight trial witnesses in September 2022, and made a supplemental expert disclosure on or about November 15, 2022. In the 33-page supplemental report (the "Supplemental Report"), Dr. Coyne detailed how he had randomly selected another 60 MRI reports prepared by Weiner and found the same pattern of false reporting of patient injuries or failures to describe important underlying degenerative conditions

as the cause of radiologic findings, which would mislead the referring physician to erroneously assume that the injuries were the result of trauma.

### B. Relevant Law

#### 1. Sufficiency of the Indictment

As discussed above in Part I, *supra,* Rule 7 of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). "'[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

The Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss charges for lack of specificity." *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999); *accord United States v. Stringer*, 730 F.3d 120, 125 (2d Cir. 2013). Indeed, the Second Circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Walsh*, 194 F.3d at 44 (citing *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). While the indictment must give a defendant "sufficient notice of the 'core of criminality' to be proven against him," *United States v. Pagan*, 721 F.2d 24, 27 (2d Cir. 1983) (quoting *United States v. Sindona*, 636 F.2d 792, 797-98 (2d Cir. 1980)), the "'core of criminality' of an offense involves the essence of a crime, in general terms," and not "the particulars of how a defendant effected the crime." *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012); *see also*

*United States v. Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005) ("[T]he indictment does not have to specify evidence or details of how the offense was committed.").

"An indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). "[C]ommon sense and reason prevail over technicalities." *United States v. Sabbeth*, 262 F.3d 207, 218 (2d Cir. 2001); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) ("While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" (quoting Fed. R. Crim. P. 7(c)(1)) (citation omitted)). Moreover, "[i]t is well settled that in an indictment for conspiring to commit an offense - in which the conspiracy is the gist of the crime - it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Wydermyer*, 51 F.3d 319, 325 (2d Cir. 1995); *see also United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002). "The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed." *Wydermyer*, 51 F.3d at 325.

A motion to dismiss an indictment is not an occasion to evaluate the sufficiency of the Government's evidence. Rule 12(b), which governs criminal pretrial motions, provides only that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion" (emphasis added). "In other words, there is no 'summary judgment' equivalent to Rule 56 of the Federal Rules of Civil Procedure in criminal cases." *United States v. Crember*, No. 12 Cr. 473 (KBF) (S.D.N.Y. Dec. 13, 2012) (citing *Alfonso*, 143 F.3d at 776-77).

2. **Bill of Particulars**

The Court set forth the relevant law regarding a bill of particulars in its opinion in *United States v. Rose*, No. 19 CR. 789 (PGG), 2021 WL 2117119 (S.D.N.Y. May 24, 2021), where it denied a bill of particulars for defendant Leon Blue. As set forth in *Rose*, Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "'prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (quoting *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (*per curiam*))). The decision to grant or deny a bill of particulars "rests within the sound discretion of the district court." *Bortnovsky*, 820 F.2d at 574.

"A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) (citing *United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995)). "Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them." *United States v. Gotti*, No. S4 02 CR 743(RCC), 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004) (citing *Bortnovsky*, 820 F.2d at 574); *accord United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) ("The standard for determining whether a bill of particulars is appropriate is based on necessity ....").

"Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574 (citations omitted); *see also United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) ("[A] bill of

particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means.") (citing *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010))). However, "[t]he Government d[oes] not fulfill its obligation merely by providing mountains of documents to defense counsel[,] who [a]re left unguided as to which documents [the Government will use at trial]." *Bortnovsky*, 820 F.2d at 575.

"[T]he proper inquiry is not whether the requested information would be helpful to the defense, but rather whether the information is *necessary* to the defense." *United States v. Dupree*, No. 10-CR-627 (KAM), 2011 WL 5976006, at *6 (E.D.N.Y. Nov. 29, 2011) (emphasis in original) (citing *Torres*, 901 F.2d at 234; *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989)). "It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts." *Feola*, 651 F. Supp. at 1132. More broadly, the Government is not required to "set out with precision every act committed by ... conspirators in furtherance of the conspiracy[.]" *United States v. Cohen*, 518 F.2d 727, 733 (2d Cir. 1975) (citations omitted). "'[W]heres, whens, and with whoms'" of the conspiracy are "'beyond the scope of a bill of particulars.'" *United States v. Barret*, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) (quoting *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001)).

Finally, "the [G]overnment need not provide particulars where it has none." *United States v. Rajaratnam*, No. 09 Cr. 1184(RJH), 2010 WL 2788168, at *9 (S.D.N.Y. July 13, 2010).

### C.      Discussion

#### 1.   Weiner's Challenge to the Sufficiency of the Indictment Is Meritless

Although unheeded by Weiner, Second Circuit case law makes plain that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Stavroulakis*, 952 F.2d at 693 (internal citations omitted); *see also United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013). That is precisely what Counts One and Two do. Count One tracks the language of the criminal statutes at issue—Sections 1349 and 1347—by alleging that Weiner "together with others known and unknown, did willfully and knowingly combine, conspire, confederate, and agree together and with each other to commit health care fraud" and that it "was a part and an object of the conspiracy" that Weiner "and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program in connection with the delivery of and payment for health care benefits, items and services." Indictment ¶¶ 27-28. Likewise, Count Two tracks the language of the criminal statute at issue—Section 1956—by alleging that Weiner "together with others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering," and that it "was a part and an object of the conspiracy" that Weiner "knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, the proceeds of healthcare fraud, in violation of 18 U.S.C. § 1347, knowing that the transactions

were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity." Indictment ¶¶ 30-31. That is all that is required, because under Second Circuit law, the Indictment need not set forth "the particulars of how a defendant effected the crime," *D'Amelio*, 683 F.3d at 418, *i.e.*, such as the precise means and mechanisms by which Weiner conspired to commit healthcare fraud and laundered the illegal proceeds to Bradley Pierre. Were that not sufficient, the 21-page speaking Indictment goes far beyond what is legally required and explains at length how Weiner, Pierre, and their co-conspirators worked together to defraud insurance companies and engage in money laundering.

Weiner's arguments to the contrary are frivolous. Weiner first asserts that the Indictment does not clarify whether Weiner is charged with conspiring to commit Travel Act bribery (Count Three). Weiner can simply look at the statutory charges located on page 15 of the Indictment, which do not list his name.[7] *See* Indictment ¶¶ 32-34.

Weiner further claims that the Indictment does not discuss Weiner's "medical judgment," Weiner Mot. at 4-5, or explain how Weiner knew or believed that his financing agreements with Bradley Pierre were phony, *id.* at 6-7. These alleged defects are nothing more than premature challenges to the sufficiency of the evidence at trial. *See, e.g.*, *United States v. Valdez*, No. 1:20-CR-00115-ALC-3, 2021 WL 1317548, at *5 (S.D.N.Y. Apr. 9, 2021), *as amended* (Apr. 9, 2021), *reconsideration granted*, No. 20-CR-115 (ALC), 2021 WL 5920829 (S.D.N.Y. Dec. 15, 2021) (rejecting challenge to the sufficiency of the indictment where the defendant claimed that the indictment did not include "any factual basis for even an inference that [the defendant] knew

---

[7] The Government also notes that Weiner already knows the answer to this question, as the Government spent hours conferring with counsel about the charges against Weiner.

a robbery was planned, or that its target was believed to be a narcotics dealer"). In any event, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *Stavroulakis*, 952 F.2d at 693. Given that Weiner is charged with healthcare fraud and money laundering, it is implicit in the Indictment that the defendant was not relying on good faith medical judgment or a good faith belief in the validity of his "loan" arrangement with Bradley Pierre.

Weiner additionally faults the Indictment for not providing lists of his false statements; for instance, charts setting forth which MRIs Weiner falsified and what lies he told insurance companies during Examinations under Oath. The Second Circuit has firmly held that an indictment must only give the defendant "sufficient notice of the 'core of criminality' to be proven against him," *Pagan*, 721 F.2d at 27 (quoting *Sindona*, 636 F.2d at 797-98), which consists of "the essence of a crime, in general terms," and not "the particulars of how a defendant effected the crime," *D'Amelio*, 683 F.3d at 418. "When the crime charged involves making false statements, 'the core of criminality is not the substance of the false statements but rather that knowing falsehoods were submitted.'" *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) (quoting *United States v. Sindona,* 636 F.2d 792, 797 (2d Cir. 1980)). The Indictment sets forth the essence of the crimes Weiner has committed, including falsifying claims of patient injuries on MRIs and lying under oath to insurance companies. Indictment ¶¶ 17-19. Nothing more is required.

Weiner finally argues that the Indictment is deficient because it does not specify in the background section of the instrument which No-Fault laws the scheme sought to exploit. Weiner Mot. at 5. In support, Weiner cites the Second Circuit's decision in *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000), for the proposition that where "an indictment charges a crime that

depends in turn on violation of another statute, the indictment must identify the underlying offense." Weiner misinterprets the holding of *Pirro.*

This Court addressed the application of *Pirro* in *United States v. Avenatti*, 432 F. Supp. 3d 354, 363–64 (S.D.N.Y. 2020). As the *Avenatti* Court explained, in *Pirro*, the Second Circuit affirmed a district court's order dismissing – prior to trial – a portion of one count charging the filing of a false 1992 U.S. income tax return for an S corporation. In the indictment, the Government alleged that the defendant (Pirro) had failed to report the ownership interest of another individual (Boyle) in the company. *United States v. Pirro*, 96 F. Supp. 2d 279, 280 (S.D.N.Y. 1999). Pirro argued that Boyle never became a shareholder in the S corporation, and that accordingly, Pirro had no obligation to report his interest on Pirro's tax return. *Pirro*, 96 F. Supp. 2d at 281. The district judge agreed and struck the allegations because "[a] review of the authority governing this issue strongly suggests that the law does not impose such a duty." *Id.* at 283. On appeal, the Second Circuit affirmed. In resolving the "battle over whether there [was] a known legal duty for *Pirro* to declare the alleged 'ownership interest' of [Boyle]," *Pirro*, 212 F.3d at 90, the Second Circuit concluded that "[t]he tax law provided *Pirro* no notice that failure to report an 'ownership interest' was criminal," and that "the indictment does not charge a violation of a known legal duty." *Id.* at 91.

*Pirro* has no application here. Counts One and Count Two – unlike the charges at issue in *Pirro* – do not allege a violation of a legal duty. They allege that the defendant violated federal law by knowingly making materially false statements to insurance companies and thereafter laundering the proceeds of the crime to a co-conspirator. There accordingly is no question of whether Weiner was on notice that his acts were criminal. Moreover, to the extent that the No-

Fault laws are relevant as background to the conspiracy, they are described in multiple paragraphs of the Indictment. *See* Indictment ¶¶ 5-6.

### 2.   The Court Should Deny Weiner's Demand for a Bill of Particulars

Weiner next demands the Government provide a bill of particulars that identifies: (a) "[e]very instance where the Grand Jury found probable cause to believe that Dr. Weiner falsified an MRI reading or pressured another radiologist to falsify his or her reading of an MRI; and (b) "[e]very statement made during an EUO where the Grand Jury found probable cause to believe the statement to be knowingly and materially false." Weiner Mot. at 9. Both demands are meritless and should be rejected.

First, the grand jury does not provide the Government with a checklist at the end of the presentation documenting which false statements it relied upon in making its probable cause determination. As the Court is aware, the grand jury decides solely whether there is probable cause to believe that the defendant committed the offenses charged in the Indictment—here, a conspiracy to commit healthcare fraud and money laundering. The Government therefore cannot respond to Weiner's demand. *See Rajaratnam*, 2010 WL 2788168, at *9 ("the [G]overnment need not provide particulars where it has none.").

Second, the Government already has provided Weiner with reports and notes generally responsive to his request for instances where Weiner falsified MRI readings or pressured radiologists to do so. The Government provided Weiner with its first expert report documenting Weiner's falsified MRI readings in April 2022, and produced a supplemental report in November 2022. In addition, the Government in April 2022 produced the notes of interviews with Weiner's former colleagues discussing Weiner's efforts to pressure other radiologists to falsify findings of

clinical injury. The Government does not possess other information responsive to Weiner's request at this time.

Third, the Government has already generally responded to Weiner's second request—namely, statements he made during an EUO that were knowing and materially false. The Government provided Weiner with a non-exhaustive list of examples during its in-person meeting with Weiner's counsel in April 2022, and by formal letter in May 2022. Weiner acknowledges that the Government provided him such information, but complains that he wants a binding list of every statement made during an EUO where the grand jury found probable cause to believe the statement to be knowingly and materially false. As previously noted, the Government does not have such a list because the grand jury does specify the alleged misrepresentations upon which it bases its finding of probable cause.

In either event, Weiner has not shown that such a list is "necessary" for the preparation of his defense. Weiner's EUO testimony consists of approximately 300 pages of his *own* statements which he can readily read, understand, and discuss with his counsel. The Indictment advises Weiner of the content of his false statements (namely, that he lied about Pierre's involvement in Nexray), the Government has conferred in person with counsel on multiple occasions about the false statements, and the Government has provided numerous examples of such lies in oral and written form. Weiner's demand for a complete and binding list of misstatements is exactly the type of "wheres, whens, and with whoms" of the conspiracy that are "beyond the scope of a bill of particulars." *Barret*, 824 F. Supp. 2d at 439 (quoting *Mitlof*, 165 F. Supp. 2d at 569). This is particularly true where the Government does not yet know Weiner's defense at trial, and additional false statements from Weiner's EUOs may become relevant and material at the start of the trial proceedings.

Fourth, Weiner's generalized complaints—that the discovery is "voluminous" and the scheme involves a "long-running fraud"—are frivolous. Weiner claims that without a bill of particulars he must "wad[e] through millions of pages" of discovery. Weiner Mot. at 7. This claim is deeply misleading, given that the Government has conferred with counsel on numerous occasions—both in person and remotely—and pointed counsel to the relevant portions of the discovery. These portions do not amount to "millions" of pages. They consist primarily of Weiner's own statements during Examinations under Oath, expert reports, text messages communications between Weiner and Pierre, and witness statements of Weiner's former colleagues. Moreover, although Weiner is alleged to have participated in a long-running fraud, the Government has already advised counsel of Weiner's primary co-conspirators, including Bradley Pierre and an unindicted co-conspirator located in New Jersey.

Lastly, Weiner's claim that it is inappropriate for the Government to engage in additional investigation following its January 2022 grand jury presentation is meritless. As an initial matter, the Government has already informed the Court and defense counsel that it has reopened its grand jury investigation in preparation for returning a superseding indictment in the first quarter of 2023. As an additional matter, Weiner is simply wrong that the Government must cease its investigation the moment that the grand jury returns a true bill. Of course, the Government is not permitted to use grand jury subpoenas in the absence of an active grand jury. However, there is no prohibition on the Government's retaining additional expert testimony and speaking with witnesses.[8]

_____

[8] Should the Government commission additional expert analysis, it will notify counsel and provide counsel the names of the patients whose MRIs will be reviewed. The Government will also confer with counsel to ensure that counsel can timely retain a counter-expert should they desire. The Government will likewise produce any additional evidence of instances where the

Weiner miscites *Pirro* for the proposition that additional investigation would constitute "fill[ing] in elements of its case with facts other than those considered by the grand jury." Weiner Mot. at 9 (quoting *Pirro*, 212 F.3d at 92 (quoting *Walsh*, 194 F.3d at 44)). As previously noted, *Pirro* addressed an entirely different issue—whether an indictment properly alleged that a defendant committed fraud by failing to comply with a legal duty. *Pirro* did not opine that the Government cannot engage in additional investigation after its initial presentation to the grand jury. Indeed, if the defendant were correct, the Government would have to return to the grand jury to re-present its case every time it obtained a new civilian witness, cooperating witness, or additional evidence. As the Court is aware, this is simply not the law.

Instead, the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial." *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992) (quoting *United States v. Heimann,* 705 F.2d 662, 666 (2d Cir.1983) (citing *United States v. Sindona,* 636 F.2d 792, 797–98 (2d Cir. 1980), *cert. denied,* 451 U.S. 912 (1981)). To the extent that the courts draw a limitation, it is through caselaw governing variances. A "variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.'" *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007) (quoting *United States v. Salmonese,* 352 F.3d 608, 621 (2d Cir.2003) (quoting *United States v. Frank,* 156 F.3d 332, 337 n. 5 (2d Cir.1998)). A defendant alleging variance must show "substantial prejudice" to warrant reversal. *Id.* (quoting *United States v. McDermott,* 918 F.2d 319, 326 (2d Cir. 1990)). "A variance is immaterial—and hence not prejudicial—'where the

---

Weiner pressured radiologists to falsify findings of clinical injury in accordance with any 3500 deadlines to be set by the Court.

allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'" *United States v. LaSpina*, 299 F.3d 165, 183 (2d Cir. 2002) (quoting *United States v. Mucciante,* 21 F.3d 1228, 1236 (2d Cir.1994) (quoting *United States v. Heimann,* 705 F.2d 662, 669 (2d Cir.1983)).

Here, while it is of course premature to address a variance claim, the Government has no reason to believe that additional investigation will result in evidence to be presented at trial that would create a prejudicial variance because the Government does not intend to prove core facts materially different than those *alleged in the Indictment*. The Indictment sets forth that Weiner falsified clinical findings of injuries on MRI reports, *see* Indictment ¶¶ 2, 8, 18, and lied during Examinations under Oath, *see id.* ¶ 19. Additional expert analysis or investigation into Weiner's false statements during EUOs will not alter those allegations. In short, the allegations in the Indictment, anticipated expert testimony at trial, and false statements in EUOs substantially correspond.  And in any event, the defendant will have sufficient notice before trial to retain a counter-expert if so desired and review witnesses' statements through the disclosure required under 18 U.S.C. § 3500. *See, e.g.*, *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) (finding no prejudicial variance where defendants were on notice of the Government's proof at trial); *United States v. Dupre*, 462 F.3d 131, 142 (2d Cir. 2006) (accord).

For the foregoing reasons, Weiner's motion to dismiss Counts One and Two of the Indictment or, in the alternative, demand for a bill of particulars, should be denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Motions should be denied in their entirety.

Dated:  New York, New York
         January 19, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York


By: _____/s/_____
    Mathew Andrews
    Louis A. Pellegrino
    Assistant United States Attorneys
    Southern District of New York
    (212) 637-6526 / 2617