


DATE DOWNLOADED: Tue Jun 13 09:44:22 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
4 NY3D 313 1 .

ALWD 7th ed.
, , 4 NY3D 313 1 .

Chicago 17th ed.
"," State Farm Mutual Automobile Insurance Co. v. Mallela, Robert : 1-42

AGLC 4th ed.
" State Farm Mutual Automobile Insurance Co. v. Mallela, Robert 1

OSCOLA 4th ed.
" 4 NY3D 313 1            Please note: citations are provided as a general
guideline. Users should consult their preferred citation format's style manual for
proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

STATE OF NEW YORK
COURT OF APPEALS

3 NY3d        687-01

Part 10

_____

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY,

    Plaintiff-Appellant,

     -against-

ROBERT MALLELA, TATIANA RYBUK, PAUL
SCHNEIDER, ADVANCE PHYSICAL MEDICINE
AND REHABILITATION, P.C. d/b/a Mill
Basin Physical Medicine, RIDGEWOOD
MEDICAL SPECIALIST AND HEMPSTEAD
VILLAGE MEDICAL, ALLIED MEDICAL HEALTH
CARE, P.C., ASTORIA PHYSICAL MEDICINE
AND REHABILITATION, P.C., ATLANTIC
MEDICAL PRACTICE, P.C., AVENUE U MEDICAL
SERVICES, P.C., BAY MEDICAL HEALTH CARE
& DIAGNOSTIC, P.C., BETTERCARE HEALTHCARE
PLAN AND MANAGEMENT, P.C. d/b/a Firstcare
of Bettercare Healthcare, CANARSIE MEDICAL
SERVICES, P.C., CENTRAL MEDICAL
REHABILITATION, P.C., CITYWIDE MEDICAL
PRACTICE, P.C., DAKA MEDICAL, P.C., d/b/a
Island Health Professionals, FARRAGUT
MEDICAL CARE, P.C.,

(Caption Continued On Inside Cover)

_____

**BRIEF OF GREGORY V. SERIO, THE SUPERINTENDENT
OF INSURANCE OF THE STATE OF NEW YORK, AS AMICUS CURIAE**

     ELIOT SPITZER
      Attorney General of the
      State of New York
     120 Broadway, 25th Floor
     New York, New York 10271
     (212) 416-8311

DANIEL SMIRLOCK
Deputy Solicitor General   Date Completed: November 23, 2004

ROBERT H. EASTON
Senior Assistant Solicitor General
  of Counsel

FIRST QUEENS PHYSICAL MED. AND
REHABILITATION, P.C., FLATBUSH MEDICAL
SERVICES, P.C., FORDHAM MEDICAL PAIN AND
TREATMENT, P.C., FRANKLIN MEDICAL REHAB.,
P.C., GRAND CENTRAL HEALTHCARE AND
PHYSICAL MEDICINE, P.C., HEALTH FIRST
MEDICAL PRACTICE, P.C., MALLELA MEDICAL
SERVICES, P.C., MEDICAL SERVICES OF
BAYSIDE, P.C., MID-ISLAND MEDICAL
HEALTHCARE, P.C., MID-QUEENS MEDICAL
SERVICES, P.C., MILLENIUM MEDICAL
DIAGNOSTICS, P.C., NY ALEA MEDICAL, P.C.,
NY PRO CARE MEDICAL & REHABILITATION, P.C.,
OCEANVIEW MEDICAL CARE, P.C., PATIENT'S
CHOICE MEDICAL SERVICES, P.C., PELHAM
PHYSICAL MEDICINE AND REHABILITATION, P.C.,
STERLING MEDICAL DIAGNOSTIC, P.C.,
TRIBOROUGH MEDICAL DIAGNOSTIC, P.C.,
VALLEY PHYSICAL MEDICINE AND
REHABILITATION, P.C., VICTORY MEDICAL,
P.C., YONKERS MEDICAL SERVICES, P.C.
d/b/a Injury Relief Medical Care, URBAN
MEDICAL DIAGNOSTICS, P.C., FRANK GOMEZ,
LEWIS BAZOKAS, OLGA GAZONAS, DOUGLAS PIEL,
DR. DAVID BASS, LAWRENCE LEFCOURT, GEORGE
BONETTI, IGOR BRODSKY, GERARD FUSARO,
GLENN GALLO, ROGER KAPLAN, KEVIN McPORTLAND,
DONALD MUSAFFI, JOSEPH MILLS, JACK CAMARDA,
ALAN COHEN, WILLIAM BATTAILE, INJURY RELIEF
MEDICAL CARE, DIPAK NANDI, STEVEN
NISSENBAUM, HAROLD ORR, ALAN PERLMUTTER,
RUTH ROGERS, PETER SWERZ, HEALTHCARE
MANAGEMENT, INC., BABYLON HEALTH CARE
MANAGEMENT, INC., BONIS MANAGEMENT CORP.,
CAMELOT MANAGEMENT, CARLE PLACE HEALTH
MANAGEMENT CORPORATION, CRISCAY MANAGEMENT
CORP., FRANKLIN HEALTHCARE MANAGEMENT
CORPORATION, GBI MANAGEMENT CORP., JEFFSAM
CORP., NIAGARA DIAGNOSTICS, INC., OFFICE
MASTER, INC., OMEGA MANAGEMENT CORPORATION,
RMK MANAGEMENT CORP., INC., TRIBOROUGH
HEALTHCARE MANAGEMENT, INC., UNIVERSAL
EXPRESS and SWADNAP LAHIRI,

       Defendants-Respondents.

STATE OF NEW YORK
COURT OF APPEALS

_____

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

                    Plaintiff-Appellant,

                    -against-                          **AFFIDAVIT OF SERVICE**

ROBERT MALLELA, et al.,

                    Defendants-Respondents.            RD = 12/13

_____

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NEW YORK )

        NAAMA POTOK, being duly sworn, deposes and says:

        I am over eighteen years of age and employed in the office

of Eliot Spitzer, Attorney General of the State of New York,

attorney for Gregory V. Serio, Superintendent of Insurance for

the State of New York, movant for permission to file brief as

amicus curiae in this appeal.  On November 23, 2004, I served one

copy of the foregoing motion to file brief as amicus curiae and

three copies of the Superintendent's proposed amicus brief by

overnight delivery on:

Evan H. Krinick                    Barry M. Fallick
Cheryl F. Korman                   Rochman, Platzer, Fallick &
Stuart M. Bodoff                   Sternheim
Rivkin Radler LLP                  666 Third Avenue
EAB Plaza                          New York, New York 10017
Uniondale, New York 11556-0111

                                   Joseph J. LaBarbera
Ross O. Silverman                  Law Offices of Joseph J.
Gil M. Soffer                      LaBarbera, P.C.
KMZ Rosenman LLP                   55 Washington Street, Ste. 602
525 East Monroe Street, Ste. 1600  Brooklyn, New York 11201
Chicago, Illinois 60661-3693

John Mark Lane
Shapiro & Lane
100 Mamaroneck Avenue
Mamaroneck, New York 10543

Sean R. Callagy
Callagy & Randolph, LLC
85 Chestnut Ridge Road, Suite 118
Montvale, New Jersey 07645

David J. Sobel
Sobel & Seidell, LLP
811 West Jericho Turnpike, Suite
201-W
Smithtown, New York 11787

LaSorsa & Beneventano
3 Barker Avenue, Second Floor
White Plains, New York 10601

Steven J. Harfenist
Friedman & Harfenist
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042

Justin N. Lite
Lite & Russell
212 Higbie Lane
West Islip, New York 11795

Douglas A. Cooper
Ruskin, Moscou, Evans &
Faltischek
190 EAB Plaza
East Tower, 15th Floor
Uniondale, New York 11556

Mark L. Furman
Hoffman Einigert & Polland LLC
220 East 42nd Street
New York, New York 10017

Allan Kuslansky
16 Warren Court
Cornwall, New York 12518


NAAMA POTOK


Sworn to before me this
23rd day of November, 2004


Senior Assistant Solicitor General
of the State of New York

2

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1

INTEREST OF THE AMICUS CURIAE . . . . . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . 4

    A.    Statutory and Regulatory Background . . . . . . . . . 4

        1.    New York Law Governing Professional
              Corporations . . . . . . . . . . . . . . . . . 4

        2.    The No-Fault Law and Regulations . . . . . . . 6

              a.    The No-Fault Statute . . . . . . . . . . 6

              b.    The No-Fault Regulations . . . . . . . . 8

    B.    The Prior Proceedings . . . . . . . . . . . . . . . 11

        1.    Mallela I . . . . . . . . . . . . . . . . . . 11

        2.    Mallela II . . . . . . . . . . . . . . . . . 12

        3.    The Second Circuit's Opinion . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 14

POINT I  -  A FRAUDULENTLY FORMED MEDICAL CORPORATION IS
           NOT ELIGIBLE FOR REIMBURSEMENT UNDER THE
           NO-FAULT LAW . . . . . . . . . . . . . . . 14

    A.    The Superintendent Promulgated Section
        65-3.16(a)(12) to Target Fraud and Abuse . . . . . 16

        1.    The revised Regulation 68 and recent
              revisions to No-Fault forms show that
              eligibility for No-Fault reimbursement
              requires more than just a facially valid
              license . . . . . . . . . . . . . . . . . 17

        2.    The Insurance Department's opinion
              letters from January 2000 confirm the
              Superintendent's intent in adopting
              Section 65-3.16(a)(12) . . . . . . . . . . 21

i

        3.    The amendments to Regulation 83 dispel
              any doubt that Section 65-3.16(a)(12)
              disqualifies fraudulently formed medical
              PCs from receiving No-Fault reimbursement  . .   23

    B.   Regulatory Restrictions and Insurance
        Department Oversight Prevent Insurers from
        Routinely Launching Investigations that Would
        Delay Payment of Valid Claims  . . . . . . . . .   26

    C.   The District Court's Remaining Concerns About
        Construing Section 65-3.16(a)(12) Broadly Are
        Unfounded  . . . . . . . . . . . . . . . . . . . .   28

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . .   32

## TABLE OF AUTHORITIES

__Cases__                                                          __Page__

Galbreath-Ruffin Corp. v. 40th and 3rd Corp.,
     19 N.Y.2d 354 (1967) . . . . . . . . . . . . . . . . . 30

Matter of ATM One, LLC v. Laudaverde,
     2 N.Y.3d 472 (2004) . . . . . . . . . . . . . . . . . 16

Matter of Co-operative Law Corp.,
     198 N.Y. 479 (1910) . . . . . . . . . . . . . . . . . 6

Matter of Medical Society of the State of N.Y. v. Levin,
     185 Misc. 2d 536 (Sup. Ct. N.Y. Co. 2000) . . . . . . . 8

Matter of Medical Society of the State of N.Y. v. Levin,
     280 A.D.2d 309 (1st Dep't 2001) . . . . . . . . . 8,22

Matter of Medical Society of the State of N.Y. v. Serio,
     100 N.Y.2d 854 (2003) . . . . . . . . . . . 4,6,8,9,10,17

Notre Dame Leasing, LLC v. Rosario,
     2 N.Y.3d 459 (2004) . . . . . . . . . . . . . . . . . 18

People v. Woodbury,
     192 N.Y. 454 (1908) . . . . . . . . . . . . . . . . . 5

Plato's Cave Corp. v. State Liquor Authority,
     68 N.Y.2d 791 (1986) . . . . . . . . . . . . . . . . . 24

State Farm Ins. Co. v. Mallela,
     175 F. Supp. 2d 401 (E.D.N.Y. 2001) . . . . . . . 2,11,12

State Farm Ins. Co. v. Mallela,
     2002 U.S. Dist. LEXIS 25187
     (E.D.N.Y. Nov. 18, 2002) . . . . . . . . 2,12,13,27,28,29,30

State Farm Ins. Co. v. Mallela,
     372 F.3d 500 (2d Cir. 2004) . . . . . . . . 2,3,13,14,23


__Statutes, Rules, and Regulations__

11 N.Y.C.R.R. § 65-1.1 . . . . . . . . . . . . . . . . 19

11 N.Y.C.R.R. § 65-3.2(c) . . . . . . . . . . . . . . . 9,27

11 N.Y.C.R.R. § 65-3.4(c)(4) . . . . . . . . . . . 17,18

11 N.Y.C.R.R. § 65-3.5(e) . . . . . . . . . . . 19,20,27

11 N.Y.C.R.R. § 65-3.8(a)(1) . . . . . . . . . . . 7

11 N.Y.C.R.R. § 65-3.8(c) . . . . . . . . . . . . . 7

11 N.Y.C.R.R. § 65-3.9 . . . . . . . . . . . . . . 7

11 N.Y.C.R.R. § 65-3.10 . . . . . . . . . . . . . 7

11 N.Y.C.R.R. § 65-3.11(a) . . . . . . . . . . . . 1

11 N.Y.C.R.R. § 65-3.16(a)(12) . . . . . . . . . . <u>passim</u>

11 N.Y.C.R.R. § 68.1(b)(2) . . . . . . . . . . . 23

11 N.Y.C.R.R. § 68.1(b)(3) . . . . . . . . . . . 24

Business Corporation Law § 602(b) . . . . . . . . 29

Business Corporation Law § 1503 . . . . . . . . . 18

Business Corporation Law § 1503(a) . . . . . . . . 5

Business Corporation Law § 1503(b) . . . . . . . . 5

Business Corporation Law § 1503(c) . . . . . . . . 5

Business Corporation Law § 1503(d) . . . . . . . . 5

Business Corporation Law § 1507 . . . . . . . . 2,5,14,18

Business Corporation Law § 1508 . . . . . . . . 2,5,14,18

Domestic Relations Law § 244-c . . . . . . . . . 29

Education Law § 6507(4)(c) . . . . . . . . . . 2,5,14

Education Law § 6509(8) . . . . . . . . . . . . 29

Education Law § 6509-a . . . . . . . . . . . . . 5,6

Education Law § 6509-b . . . . . . . . . . . . . 29

Education Law § 6512 . . . . . . . . . . . . . . 16

iv

Insurance Law § 301 . . . . . . . . . . . . . . . . . . . . 4,8

Insurance Law § 401(b) . . . . . . . . . . . . . . . . . . . 9

Insurance Law § 5102(a)(1) . . . . . . . . . . . . . . 7,11,17

Insurance Law § 5103(a) . . . . . . . . . . . . . . . . . . 7

Insurance Law § 5103(d) . . . . . . . . . . . . . . . . . . 8

Insurance Law § 5106 . . . . . . . . . . . . . . . . . . . . 8

Insurance Law § 5106(a) . . . . . . . . . . . . . . . . . . 7

Insurance Law § 5108 . . . . . . . . . . . . . . . . . . . . 7

Insurance Law § 5108(b) . . . . . . . . . . . . . . . . . . 8

McKinney's Cons. Laws of N.Y., Book 1, Stat. § 223 . . . . 24,25

**Other Authorities**

2001-19 N.Y. St. Reg. 17 . . . . . . . . . . . . . . . . . 11

Committee on Fraud in Health Care of the N.Y. Board
     of Professional Medical Conduct,
     Report on Fee Splitting, Mar. 5, 2001 . . . . . . . . . 6

N.Y. St. Reg., Aug. 18, 2004 . . . . . . . . . . . . . . 23,24

N.Y. St. Reg., Oct. 6, 2004 . . . . . . . . . . . . 4,25,26,27,28

Opinion of N.Y.S. Ins. Dept., Jan. 11, 2000, at
     http://www.ins.state.ny.us/rg000111.htm . . . . . . . 21

Opinion of N.Y.S. Ins. Dept., Jan. 26, 2000, at
     http://www.ins.state.ny.us/rg000126.htm . . . . . . . 22

Robert Worth, "Fraud Charged at Six Clinics in
     Westchester and Rockland," N.Y. Times, Jan. 31, 2001 . . 10

Susan Edelman and Christopher Francescani, "Clinics
     Paying $5000 a Year for Rent-a-Docs - Med Mills
     Get No-Show Pros to Act as Fronts," N.Y. Post,
     Jul. 16, 2000 . . . . . . . . . . . . . . . . . . . . . 10

## PRELIMINARY STATEMENT

Gregory V. Serio, the Superintendent of Insurance for the State of New York (the "Superintendent"), submits this brief as amicus curiae in support of Plaintiff-Appellant, State Farm Mutual Automobile Insurance Company ("State Farm").  State Farm has sued Defendants-Respondents Robert Mallela, et al., in federal court for declaratory relief and damages, asserting that defendant medical professional corporations ("PCs") are ineligible under the Comprehensive Motor Vehicle Insurance Reparations Act, codified at Article 51 of the Insurance Law (the "No-Fault Law"), for reimbursement of claims for medical expenses assigned to them by injured persons.[1]

State Farm alleges that Defendants-Respondents perpetrated a fraudulent scheme in which licensed physicians agreed to lend their names and licenses, for a fee, to facilitate the fraudulent formation of medical PCs owned and controlled by laypersons in violation of Article 15 of the Business Corporation Law ("BCL") and New York's long-standing prohibition against the corporate practice of medicine.  According to State Farm, the medical PCs falsely identified the licensed physicians as owners to obtain

---

[1] Pursuant to 11 N.Y.C.R.R. § 65-3.11(a), health care providers may accept assignments of claims for No-Fault benefits from injured parties in lieu of payment.  After obtaining such assignments, the providers then may seek reimbursement directly from insurers.

required certificates of authority from the New York State
Department of Education.

State Farm contends that such fraudulently formed medical
PCs are ineligible for No-Fault reimbursement under 11 N.Y.C.R.R.
§ 65-3.16(a)(12), which the Superintendent promulgated in August
2001 and which took effect in April 2002.  Section 65-3.16(a)(12)
states that a "provider of health care services is not eligible
for reimbursement . . . if the provider fails to meet any
applicable New York State or local licensing requirement
necessary to perform such service in New York . . . ."

The United States District Court for the Eastern District of
New York (Sifton, J.) dismissed State Farm's claims with
prejudice, holding that Section 65-3.16(a)(12) requires that a
health provider need only hold a facially valid license of the
proper kind to be eligible for reimbursement under the No-Fault
Law.  State Farm Ins. Co. v. Mallela, 2002 U.S. Dist. LEXIS
25187, at *34-*35 (E.D.N.Y. Nov. 18, 2002) ("Mallela II"); see
also State Farm Ins. Co. v. Mallela, 175 F. Supp. 2d 401, 414
(E.D.N.Y. 2001) ("Mallela I") (same).

On appeal, the United States Court of Appeals for the Second
Circuit determined that Section 65-3.16(a)(12) is ambiguous, and
certified the following question to this Court:

> Is a medical corporation that was fraudulently
> incorporated under N.Y. Business Corporation Law
> §§ 1507, 1508, and N.Y. Education Law § 6507(4)(c)
> entitled to be reimbursed by insurers, under New

2

York Insurance Law §§ 5101 <u>et seq.</u> and its
implementing regulations, for medical services
rendered by licensed medical practitioners?

<u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 372 F.3d 500, 505-06,

510 (2d Cir. 2004).

The Superintendent urges this Court to answer the certified

question in the negative and hold that Section 65-3.16(a)(12)

disqualifies a fraudulently incorporated medical PC from

obtaining reimbursement under the No-Fault Law.  Pursuant to

authority vested in him by the Legislature, the Superintendent

promulgated Section 65-3.16(a)(12) to clarify that eligibility

for No-Fault reimbursement is limited to health care providers

that, in contrast to fraudulently formed medical PCs, are

lawfully authorized to provide and bill for health care services

consistent with New York law.  This rule of eligibility combats a

form of fraud and abuse that has in recent years plagued the No-

Fault system, and ensures that injured persons receive access to

quality medical care.  Because a fraudulently formed medical PC

procures any facial authorization to practice medicine by fraud

and thus operates in violation of BCL Article 15 and the long-

standing prohibition on the corporate practice of medicine, this

Court should hold that Section 65-3.16(a)(12) precludes such an

entity from obtaining reimbursement under the No-Fault Law.

3

## INTEREST OF THE AMICUS CURIAE

The Superintendent has broad authority to promulgate regulations interpreting, clarifying, and implementing legislative policy under the No-Fault Law.  See Matter of Medical Society of the State of New York v. Serio, 100 N.Y.2d 854, 863-64 (2003) (citing Ins. Law § 301).  Pursuant to that authority, the Superintendent promulgated "Regulation 68," 11 N.Y.C.R.R. Part 65, the enactment of which this Court upheld in Medical Society.

In particular, the Superintendent promulgated Section 65-3.16(a)(12) to prevent a health provider who is not lawfully authorized to provide and bill for health care services in New York from obtaining reimbursement under the No-Fault Law.  The Superintendent has a compelling interest in ensuring that Section 65-3.16(a)(12) is properly construed to serve its intended purpose.

## STATEMENT OF THE CASE

**A.   Statutory and Regulatory Background**

**1.   New York Law Governing Professional Corporations**

Article 15 of the BCL governs the formation and operation of professional service corporations.  While a business corporation owned or operated by a layperson cannot lawfully practice medicine or bill for medical services, Article 15 permits the formation of a PC authorized to practice medicine where ownership

4

and control of the corporation resides entirely in one or more licensed physicians who themselves practice in the corporation. See BCL §§ 1503(a), 1507, 1508.

In order to incorporate as a medical PC, a prospective entity first must obtain a certificate of authority from the Department of Education ("DOE") certifying that the individuals organizing the PC are licensed and currently registered to practice medicine. See Educ. Law 6507(4)(c). The prospective PC then must file its certificate of incorporation, attaching the certificate of authority, with both the Department of State and the DOE. BCL § 1503(b)-(c).[2]

The requirement that a medical PC be owned and controlled by licensed physicians practicing within the PC, and the requirement to obtain a certificate of authority from the DOE, are not mere technicalities of corporate formation. Rather, they serve to protect the public and ensure the quality and integrity of medical services provided through PCs, by enforcing the deeply-rooted prohibition against the corporate practice of medicine. See People v. Woodbury, 192 N.Y. 454 (1908) (holding that ordinary corporations may not practice medicine); see also Educ.

---

[2] After incorporation, a medical PC is subject to disciplinary proceedings and penalties in the same manner that a licensed physician is, and its certificate of incorporation is subject to suspension, revocation, or annulment. BCL § 1503(d).

Law § 6509-a (prohibiting fee-splitting for professional health care services, except in limited circumstances).

That prohibition stems from the belief that no physician should owe allegiance to a "corporation, conducted [as] it may be wholly by laymen, organized simply to make money and not" to provide the highest-quality medical care. Matter of Co-operative Law Corp., 198 N.Y. 479, 484 (1910). The provisions of the BCL thus "reduce opportunities for fraud by prohibiting arrangements in which someone other than the physician has a financial incentive for increasing the physicians's revenues." Committee on Fraud in Health Care of the New York Board for Professional Medical Conduct, Report on Fee Splitting, Mar. 5, 2001 (A1296).

### 2.   The No-Fault Law and Regulations

#### a.   The No-Fault Statute

In 1973, the State Legislature enacted the No-Fault Law, which "supplanted common-law tort actions for most victims of automobile accidents with a system of no-fault insurance." Medical Society, 100 N.Y.2d at 860. "The primary aims of this new system were to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts, and to provide substantial premium savings to New York motorists." Id.

6

To this end, Insurance Law § 5103(a) provides that every liability insurance policy issued on a motor vehicle shall provide for payment of "first party benefits."  Such first-party benefits include payments for "basic economic loss," defined in Insurance Law § 5102(a)(1) to include, among other things, necessary expenses for medical services and other professional health services.  Insurance Law § 5108, in turn, provides that the charges for the professional health services described in Section 5102(a)(1) generally shall be based on the worker's compensation fee schedules for industrial accidents, with the Superintendent to promulgate implementing regulations.  See 11 N.Y.C.R.R. Part 68 ("Regulation 83").

Insurance Law § 5106(a) instructs that payment of first-party benefits be made by an insurer "as the loss is incurred," and that "[s]uch benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained."  See also 11 N.Y.C.R.R. § 65-3.8(a)(1), (c). Overdue payments bear interest of 2% per month, and the claimant is entitled to attorneys' fees for services necessary to secure payment of benefits, subject to limitations established by the Superintendent by regulation.  Ins. Law. § 5106(a); see also 11 N.Y.C.R.R. §§ 65-3.9, 65-3.10.

b.   **The No-Fault Regulations**

Since the 1970s, the Superintendent has promulgated comprehensive regulations to fill the interstices in the No-Fault Law left open by the Legislature.  See Ins. Law. § 301 (authorizing the Superintendent to prescribe regulations "not inconsistent with the provisions" of the Insurance Law); see also id. §§ 5103(d), 5106, 5108(b) (specifically authorizing the Superintendent to promulgate regulations regarding aspects of the No-Fault Law).  As recently as last year, this Court affirmed the Superintendent's "broad power to interpret, clarify and implement the legislative policy" of the No-Fault Law, holding that the Superintendent's interpretation "if not irrational or unreasonable, will be upheld in deference to his special competence and expertise with respect to the insurance industry, unless it runs counter to the clear wording of a statutory provision."  Medical Society, 100 N.Y.2d at 863-64 (internal quotations omitted).

The certified question here centers on a regulatory provision adopted by the Superintendent in August 2001 as part of a revised Regulation 68.[3]  The Superintendent promulgated that

---

[3] The Superintendent's first attempt to promulgate Regulation 68 was invalidated for failure to comply with pertinent provisions of the State Administrative Procedure Act ("SAPA").  See Matter of Med. Soc'y v. Levin, 185 Misc. 2d 536 (Sup. Ct. N.Y. Co. 2000), aff'd 280 A.D.2d 309 (1st Dep't 2001). This Court subsequently upheld the revised Regulation 68 over similar challenge.  Medical Society, 100 N.Y.2d 854.

regulation in direct response to fraudulent and abusive No-Fault claims practices that increased significantly in the 1990s.  As this Court noted in <u>Medical Society</u>:

- The Insurance Department noticed that reports of no-fault fraud increased more than 1700% between 1992 and 2000.

- No-fault fraud accounted for three-quarters of the 16,902 reports of automobile fraud in 2000, and more than 55% of the 22,247 reports of all types of insurance fraud.

- No-fault fraud was responsible for an estimated increase of over $100 per year in annual insurance premium costs for the average New York motorist.

100 N.Y.2d at 861.  In light of these developments, the Superintendent established a No-Fault Unit within the Frauds Bureau of the Insurance Department to focus specifically on fraudulent and abusive claims practices that pervaded the No-Fault system.  <u>Id.</u>; <u>see also</u> Ins. Law. § 401(b) (giving the Superintendent "broad authority to investigate activities which may be fraudulent and to develop evidence thereon").

Particular targets of the Superintendent were "medical mills," corrupt medical clinics that generate "stacks of medical bills . . . detailing treatments and tests that [a]re unnecessary or never performed," often for passengers "involved" in staged automobile accidents.  <u>Medical Society</u>, 100 N.Y.2d at 861. Medical mills are commonly "doc-in-a-box" clinics in which businessmen essentially pay for the use of physicians' licenses so that they can fraudulently incorporate as medical PCs,

9

skirting State laws proscribing the corporate practice of
medicine.   <u>See</u> Susan Edelman and Christopher Francescani,
"Clinics Paying $5000 a Year for Rent-a-Docs - Med Mills Get No-
Show Pros to Act as Fronts," <u>N.Y. Post</u>, Jul. 16, 2000, at 4;
Robert Worth, "Fraud Charged at Six Clinics in Westchester and
Rockland," <u>N.Y. Times</u>, Jan. 31, 2001, at B6.

In <u>Medical Society</u>, this Court focused principally on the
provisions in the revised Regulation 68 that have reduced a
claimant's time to file notice of claim from 90 to 30 days, and
reduced the time to submit proof of loss due to medical treatment
from 180 to 45 days.  100 N.Y.2d at 862.  The Superintendent
promulgated those provisions upon concluding that medical mills
and other unscrupulous claimants were exploiting the longer
periods by filing claims well after an accident occurred and
medical services were rendered, thereby thwarting insurers from
investigating effectively the legitimacy and extent of claimed
injuries and treatment.  <u>Id.</u> at 861-62.  The shortened periods
thus were intended to permit more effective investigation of
claims by insurers, and to make it more difficult for medical
mills to submit fraudulent or abusive claims without detection.
<u>Id.</u> at 862.

In addition to shortening claims periods, the Superintendent
promulgated Section 65-3.16(a)(12), which directs that a
"provider of health care services is not eligible for

10

reimbursement under Section 5102(a)(1) of the Insurance Law if
the provider fails to meet any applicable New York State or local
licensing requirement necessary to perform such service in New
York . . . ."  According to SAPA notice documents, Section
65-3.16(a)(12) was "added to clarify that a health care provider
must be properly licensed to be eligible for reimbursement under
no-fault." 2001-19 N.Y. St. Reg. 17, at 6.  The Superintendent
promulgated this provision to prevent unlicensed laypersons and
fraudulently formed medical PCs from exploiting the No-Fault
system, while ensuring that real accident victims with true
injuries receive quality medical care from licensed professionals
whose professional judgment is not compromised.

### B.   The Prior Proceedings

#### 1.   Mallela I

In Mallela I, the federal district court rejected State
Farm's claims in the belief that there is no basis in the No-
Fault Law or in any of its implementing regulations to conclude
that a fraudulently incorporated medical PC is ineligible for No-
Fault reimbursement.  Mallela I, 175 F. Supp. 2d at 414.
Accordingly, the court dismissed without prejudice State Farm's
request for a declaratory judgment and its common law claims for
fraud and unjust enrichment for recovery of monies previously
paid, holding that the defendants' alleged violations of the BCL

did "not relieve plaintiff of its obligation to reimburse its insureds, or its insureds' assignees who are 'providers of services,' for covered basic economic loss." Id. at 418.

In so doing, the district court emphasized that State Farm had not alleged (1) that the individual practitioners who had provided medical services (as opposed to the PCs employing those practitioners) were not properly or lawfully licensed, or (2) that the services billed for either had not actually been provided or were not medically necessary. Id. at 415. In the absence of such allegations, the court concluded that State Farm had no basis to deny reimbursement on the sole ground that the allegedly fraudulently formed PCs were not lawfully authorized to practice medicine or to bill for medical services.


        2.   Mallela II

State Farm thereafter amended its complaint, but did not add allegations asserting that the individual practitioners were not lawfully licensed, or that billed services had not been provided or were not medically necessary. On November 18, 2002, the federal district court again granted the defendants' motion to dismiss, this time with prejudice and without leave to replead. Mallela II, 2002 U.S. Dist. LEXIS 25187, at *63-*64.

The Superintendent promulgated the revised Regulation 68 after Mallela I was decided, but before the decision in Mallela

12

II.  In considering the applicability of Section 65-3.16(a)(12)
to State Farm's claims, the court found the provision ambiguous.
Judge Sifton noted that Section 65-3.16(a)(12) could be read
either to require only that a provider possess a facially valid
license, or to allow an insurer to inquire whether such a license
was properly obtained in the first instance.  See Mallela, 2002
U.S. Dist LEXIS 25187, at *30,*34-*36.  The court resolved the
ambiguity in favor of the defendants on the ground that allowing
insurers to look behind a facially valid license would undermine
the No-Fault Law's objective of ensuring prompt, uncontested
payment of benefits to claimants and their health care providers.
Id. at *34-*36.


### 3.   The Second Circuit's Opinion

On appeal, the Second Circuit agreed with the district
court's determination in Mallela II that Section 65-3.16(a)(12)
is ambiguous.  Mallela, 372 F.3d at 506.  The Circuit noted,
however, that two opinion letters issued by the Insurance
Department in January 2000 confirmed the agency's view that a
medical PC not properly formed under New York law is ineligible
for reimbursement under the No-Fault Law.  Mallela, 372 F.3d at
506.  Nevertheless, the appeals court dismissed those letters as
"informal and not binding on any court."  Id. (internal
quotations omitted).

In light of the asserted ambiguity in Section 65-3.16(a)(12), the Second Circuit determined that New York law was unclear, and thus certified the following question to this Court:

> Is a medical corporation that was fraudulently incorporated under N.Y. Business Corporation Law §§ 1507, 1508, and N.Y. Education Law § 6507(4)(c) entitled to be reimbursed by insurers, under New York Insurance Law §§ 5101 et seq. and its implementing regulations, for medical services rendered by licensed medical practitioners?

By order dated September 2, 2004, this Court accepted certification of this question.

### ARGUMENT

### POINT I

### A FRAUDULENTLY FORMED MEDICAL CORPORATION IS NOT ELIGIBLE FOR REIMBURSEMENT UNDER THE NO-FAULT LAW

The Superintendent promulgated 11 N.Y.C.R.R. § 65-3.16(a)(12) with the intent to disqualify fraudulently formed medical PCS from eligibility for reimbursement under the No-Fault Law.  Indeed, the Superintendent's intent is evident from a variety of regulatory sources and materials.

First, the revised Regulation 68 not only added Section 65-3.16(a)(12) to the No-Fault regulations; it also revised the No-Fault form ("Form NF-3") - which each health provider must complete to obtain reimbursement from an insurer - to include a question that asks corporate health care providers to list the names and licensing credentials of its owners.  The revision to

14

this form makes sense only if improperly formed medical PCs are ineligible for reimbursement.

Second, two Insurance Department opinion letters from January 2000 illuminate the Superintendent's intent in adopting Section 65-3.16(a)(12). Although those letters by their very terms state that they are not binding on any court, they make clear that providers engaged in the corporate practice of medicine are not lawfully authorized to qualify for No-Fault reimbursement.

Third, the Superintendent's amendments in October 2004 to Regulation 83, which governs No-Fault fee schedules and must be read in pari materia with Section 65-3.16(a)(12) of the revised Regulation 68, erase any doubt about the Superintendent's position: fraudulently formed medical PCs are not eligible for No-Fault reimbursement under Section 65-3.16(a)(12).

Nor is there any merit to the district court's concern that the Superintendent's intended reading of Section 65-3.16(a)(12) will delay payment of valid claims. Critically, that provision applies only where health care providers seek reimbursement from insurers after assignment of a claim by an injured person; it does not affect the payment of claims to the injured person herself. But most of all, vigilant enforcement and ongoing oversight by the Insurance Department prevents insurers from

15

overreaching in their investigations of claims, and thus ensures that payment of legitimate claims is not unfairly delayed.

**A.    The Superintendent Promulgated Section 65-3.16(a)(12) to Target No-Fault Fraud and Abuse.**

In regulatory interpretation, the lodestar is the intent of the promulgating authority.  See Matter of ATM One, LLC v. Landaverde, 2 N.Y.3d 472, 476-477 (2004) (holding that "intent is the great and controlling principle, and the proper judicial function is to discern and apply the will of the [agency]") (internal quotations omitted).  The Superintendent intended Section 65-3.16(a)(12) to require that a health care provider, as a condition of eligibility for No-Fault reimbursement, hold a facially valid license and be lawfully authorized to provide and bill for health care services.  A medical PC organized by a layperson who obtains a certificate of authority from the DOE by fraud does not qualify for reimbursement, for that entity's conduct violates both BCL Article 15 and the prohibition against the corporate practice of medicine.  Thus, that medical PC cannot be said to be "lawfully" authorized to provide and bill for medical services, since any facial authorization to practice medicine that the entity may have received is tainted ab initio by the fraud used to procure it.  See Educ. Law. § 6512 (noting that obtaining of a professional license by fraud is a form of unauthorized practice of the profession).  Because the

16

Superintendent's intended reading of Section 65-3.16(a)(12) is reasonable and not contrary to any provision of the No-Fault Law, it is entitled to deference.  See Medical Society, 100 N.Y.2d at 863-64.

The federal district court and the Second Circuit concluded that the Superintendent's intent was impossible to discern from the plain text of Section 65-3.16(a)(12).  But they failed to recognize that Section 65-3.4(c)(4) of the revised Regulation 68, as well as two opinion letters issued by the Insurance Department in January 2000, shed considerable light on the meaning of the provision in question.  Moreover, both courts acted without the benefit of the Superintendent's October 2004 amendments to Regulation 83, which further confirm that Section 65-3.16(a)(12) was intended to require a health care provider to have more than a facially valid license in order to obtain reimbursement under the No-Fault Law.

> **1.  The revised Regulation 68 and recent revisions to No-Fault forms show that eligibility for No-Fault reimbursement requires more than just a facially valid license.**

As noted, Section 65-3.16(a)(12) provides that a "provider of health care services is not eligible for reimbursement under Section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement

17

necessary to perform such service in New York." The federal
district court construed this language to require only that a
health care provider possess a facially valid license, thereby
rejecting an interpretation that allows any inquiry by an insurer
into whether that license was properly obtained in the first
instance. However, other provisions of the revised Regulation 68
make clear that the Superintendent intended to allow insurers to
conduct just such an inquiry. See Notre Dame Leasing, LLC v.
Rosario, 2 N.Y.3d 459, 464 (2004) (reciting "well-settled
principle" that act "must be construed as a whole" and "its
various sections  . . . considered together and with reference to
each other").

Significantly, Section 65-3.4(c)(4) revised Form NF-3, the
form that all health providers (other than hospitals) must submit
to insurers in seeking reimbursement under the No-Fault Law.
Question 17 of that revised form reads as follows: "If the
provider of service is a professional service corporation or
doing business under an assumed name (DBA), list the owner [sic]
and professional licensing credentials of all owners." Compare
A2290 with A2307.

The Superintendent's addition of Question 17 to Form NF-3
makes sense only if a PC's substantive compliance with BCL §§
1503, 1507, and 1508 and the corporate practice prohibition is
relevant to the entity's eligibility for reimbursement under the

18

No-Fault Law.  If all that Section 65-3.16(a)(12) required were a
facially valid license, Question 17 would serve no purpose; a PC
would need only to certify that it had a certificate of
incorporation on file with the Department of State and the DOE,
with the required certificate of authority attached.  The
addition of Question 17 thus demonstrates that the Superintendent
intended to render ineligible any medical PC that was formed with
the purpose of evading the State's long-standing ban on the
corporate practice of medicine.  Indeed, the Superintendent
crafted Question 17 precisely to target situations similar to
what State Farm alleges – namely, the fraudulent formation of
medical PC that by all outward appearances are operating
lawfully.

The Superintendent's intent also is evident from Section 65-
3.5(e) of the revised Regulation 68.  That provision, coupled
with the formal conditions of coverage set forth in 11 N.Y.C.R.R.
§ 65-1.1, permits insurers to conduct "examinations under oath"
("EUOs") of any applicant for No-Fault benefits where the insurer
"has a reasonable belief that a person or entity [seeking
reimbursement] is not properly licensed under New York law in
order to be eligible to receive No-fault reimbursement."  Id.;
N.Y. St. Reg., Oct. 6, 2004, at 14; see also 11 N.Y.C.R.R. § 65-
3.2(c) (mandating that insurers "not demand verification of facts
unless there are good reasons to do so" and that verification be

"done as expeditiously as possible").  Moreover, these
examinations may be conducted only after the insurer applies, for
each claim, "objective standards" that govern the use of EUOs.
11 N.Y.C.R.R. § 65-3.5(e).  Those standards are subject to
ongoing "review" by Insurance Department examiners.  Id.  Thus,
where an insurer has a sound reason to believe that a medical PC
seeking reimbursement was fraudulently formed or has engaged in
fraudulent or abusive billing practices, it may resort to an EUO
to verify the legitimacy of a claim.

       An interpretation of Section 65-3.16(a)(12) that allows
insurers in carefully circumscribed circumstances to inquire into
whether a medical PC was fraudulently formed is consistent with
one of the cardinal purposes underlying the Superintendent's
promulgation of the revised Regulation 68.  That regulation was
intended to combat No-Fault fraud and abuse perpetrated largely
by medical mills, which, as discussed supra at 9-10, often are
fraudulently formed medical PCs.  Such PCs use sophisticated
structures to create an appearance of compliance, often "renting"
physicians' licenses in order to obtain facially valid
certificates of authority from the DOE.  The district court's
narrow interpretation of Section 65-3.16(a)(12) - as barring No-
Fault reimbursement only to providers that lack a facially valid
license - undermines one of the Superintendent's central goals of
the revised Regulation 68, by failing to fight the proliferation

and conduct of medical mills, and by permitting them to continue
to game the No-Fault system for improper gain.

> **2. The Insurance Department's opinion letters
> from January 2000 confirm the
> Superintendent's intent in adopting Section
> 65-3.16(a)(12).**

Apart from the text of various provisions in the revised
Regulation 68, the Superintendent's intent in promulgating
Section 65-3.16(a)(12) also is clear from two opinion letters
that the Insurance Department issued in January 2000.  Those
letters clarify that a corporate health provider is eligible for
No-Fault reimbursement only if properly and lawfully formed under
New York law.

Indeed, in its January 11, 2000 opinion letter, the
Insurance Department stated that in order to have "standing" to
receive No-Fault reimbursement, a health care provider must be
"lawfully authorized to bill for No-Fault services under New York
State law."  Opinion of N.Y.S. Ins. Dept., Jan. 11, 2000, p. 2,
at http://www.ins.state.ny.us/ rg000111.htm.  Even prior to the
promulgation of the revised Regulation 68, the Insurance
Department's view was that fraudulently formed medical PCs were
not "authorized to bill for No-Fault services under New York law"
where they (1) violated the requirements of BCL Article 15; (2)
violated the prohibition on the corporate practice of medicine;

21

and (3) procured their facially valid certificates of authority by fraud.

In fact, the Superintendent first attempted to codify the standing requirement articulated in the January 11, 2000 opinion letter in the version of Regulation 68 promulgated in November 1999 which was subsequently invalidated.  See Medical Society v. Levin, 280 A.D.2d 309 (1st Dep't 2001).  The 1999 version of Regulation 68 provided that upon an injured person's assignment of claims, an insurer was to pay benefits directly to "state licensed providers of health care services."  In an opinion letter dated January 26, 2000, the Insurance Department stated that the phrase "state licensed" was intended

> to clarify explicitly that which had been required
> without specificity, which is that when a provider of
> health benefits is given an assignment by an eligible
> injured person and becomes the claimant for purposes of
> reimbursement for covered services (i.e. medically
> necessary services) that assignee must . . . adhere to
> all applicable New York statutes which grant the
> authority to provide health care services in New York
> State.

Opinion of N.Y.S. Ins. Dept., Jan. 26, 2000, p. 1, at http://www.ins.state.ny.us/rg000126.htm.  Significantly, that opinion letter further noted that medical PCs were eligible for No-Fault reimbursement only if they were "properly licensed to perform services, so as not to engage in the corporate practice of medicine."  Id.  Thus, fraudulently formed PCs could never satisfy that standard.

After the 1999 version of Regulation 68 was invalidated, the Superintendent in August 2001 promulgated the revised Regulation 68, including Section 65-3.16(a)(12).  That provision, which SAPA documents describe as "clarify[ing]" existing law, was the Superintendent's second attempt to codify the standing requirement described in both the January 11, 2000 and January 26, 2000 opinion letters.  Because the Superintendent intended Section 65-3.16(a)(12) to make express what he believed had previously been implied, the opinion letters - regardless of whether they are not binding on any court, see Mallela, 372 F.3d at 506 - provide valuable insight nonetheless into the intended purpose of Section 65-3.16(a)(12).

3.   **The amendments to Regulation 83 dispel any doubt that Section 65-3.16(a)(12) disqualifies fraudulently formed medical PCs from receiving no-fault reimbursement.**

In October 2004, the Superintendent promulgated a final amendment to Regulation 83, 11 N.Y.C.R.R. Part 68, which addresses the fee schedules for professional health services under the No-Fault Law.  See Ins. Law §§ 5102, 5108.  These amendments to Regulation 83, which had not yet been promulgated when the federal district court and the Second Circuit considered this matter, confirm that the Superintendent did not intend for fraudulently formed PCs to be eligible for No-Fault reimbursement under Section 65-3.16(a)(12).

23

11 N.Y.C.R.R. § 68.1(b)(2) of Regulation 83 provides that the fee for professional health services be the established fee for the "licensed health care provider" that provides the service. N.Y. St. Reg., Aug. 18, 2004, at 30. Section 68.1(b)(3), in turn, defines "licensed health provider" as "a licensed healthcare professional acting within the scope of his or her licensure or <u>an entity properly formed in accordance with applicable law</u> and acting within the scope of its license." <u>Id.</u> (emphasis added). That definition ensures "that <u>only properly structured and licensed business entities</u> provide care to eligible parties." N.Y. St. Reg., Oct. 6, 2004, at 13 (emphasis added). Thus, Regulation 83, as amended, contemplates that fraudulently formed PCs do not meet the definition of "licensed health provider."

Whereas Section 65-3.16(a)(12) of the revised Regulation 68 addresses the question of whether a health care provider is eligible to receive No-Fault reimbursement at all, Section 68.1(b) of amended Regulation 83 governs the fee levels at which providers are eligible for reimbursement. Because Regulations 68 and 83 relate to "the same or cognate subjects," they "are <u>in pari materia</u> and to be construed together." <u>Plato's Cave Corp. v. State Liquor Authority</u>, 68 N.Y.2d 791, 793 (1986); <u>see also</u> McKinney's Cons. Laws of New York, Book 1, Stat. § 223 ("A

24

subsequent act <u>in pari materia</u> may be considered as an aid in the construction of an earlier statute or section.").

The amended Regulation 83 is particularly helpful in construing the revised Regulation 68 because the Superintendent plainly "had in mind the earlier act and its purpose" when he promulgated the later regulation. McKinney's Cons. Laws of New York, Book 1, Stat. § 223. For example, the SAPA documents for Regulation 83 state that the definition of "licensed health care provider" "clarifies the clear intent of the No-Fault law that reimbursement for no-fault providers is limited only to entities and providers properly and lawfully licensed to provide reimbursable health services." N.Y. St. Reg., Oct. 6, 2004, at 14. Further, the amendments to Regulation 83, like the revised Regulation 68, were inspired largely by concerns about fraud and abuse in the No-Fault system, especially as perpetrated by medical mills. <u>See</u> N.Y. St. Reg., Oct. 6, 2004, at 13-14 (describing intent of Regulation 83 as reduction of financial incentives to establish "medical mills" that exploit the No-Fault system through abusive practices).

In fact, the SAPA documents for the recent amendments to Regulation 83 specifically address corporate structures similar to the fraudulent scheme alleged by State Farm here:

> There have been instances under No-fault where medical professional corporations have been established to provide health care using licensed non-physicians in order to bill at the higher

25

> physician rate. . . .   Some of these corporations
> have had their income siphoned off by management
> companies through costly rental agreements,
> billing and maintenance services charges.  It was
> not the Legislature's intent in enacting the
> No-fault law to enrich individuals who manipulate
> the system at the expense of premium-paying
> consumers.  This regulation will enhance the
> quality of care provided to eligible injured
> parties by insuring that those delivering
> reimbursable services are held to appropriate
> professional standards.

N.Y. St. Reg., Oct. 6, 2004, at 14.   The amendments to Regulation

83 thus inform the correct interpretation, in the

Superintendent's view, of 11 N.Y.C.R.R. § 65-3.16(a)(12).   The

language of Regulation 83 and related SAPA documents confirm that

an entity is eligible for No-Fault reimbursement under Section

65-3.16(a)(12) only if "properly formed in accordance with

applicable law" and "properly structured and licensed."

Fraudulently formed medical PCs meet neither of those

requirements.


**B.     Regulatory Restrictions and Insurance Department
         Oversight Prevent Insurers from Routinely
         Launching Investigations that Would Delay Payment
         of Valid Claims.**

Lacking the benefit of the amendments to Regulation 83, and

wrongly discounting the revision to Form NF-3, other relevant

regulatory provisions, and the two opinion letters as

interpretive guides, the district court adopted an unduly narrow

interpretation of Section 65-3.16(a)(12).   In holding that a

health provider need only hold a facially valid license to be
eligible for reimbursement under the No-Fault Law, the court
concluded that its interpretation of Section 65-3.16(a)(12) was
more consistent with "the legislative goal of speedy payment" of
No-Fault benefits, because if an insurer cannot routinely
undertake investigations into a provider's corporate structure,
the payment of valid claims will not be delayed.  Mallela II,
2002 U.S. Dist. LEXIS 25187, at *33-*38.  The district court
overstated the extent to which interpreting Section 65-
3.16(a)(12) to allow insurers to look behind facially valid
licenses would frustrate the legislative goal of speedy claims
payment.

As discussed supra at 19-20, insurers are subject to the
close regulatory oversight of the Department, and face penalties
and other sanctions if they request claims verification without a
specific reason to do so in a particular case.  See 11 N.Y.C.R.R
§ 65-3.5(e).  Indeed, an insurer may request additional
verification as to a health care provider's eligibility under
Section 65-3.16(a)(12) only if there are "valid reasons to do so"
— i.e., where the insurer "has a reasonable belief that a person
or entity [seeking reimbursement] is not properly licensed under
New York law in order to be eligible to receive No-fault
reimbursement."  N.Y. St. Reg., Oct. 6, 2004, at 14; see also 11
N.Y.C.R.R § 65-3.2(c) (mandating that insurers "not demand

27

verification of facts unless there are good reasons to do so" and
that verification be "done as expeditiously as possible").

To be sure, the Insurance Department is closely monitoring
insurer compliance with these requirements "through the
submission of complaints," and it has "the authority to conduct
market conduct investigations of insurers and impose penalties as
is necessary to prevent such abuse." N.Y. St. Reg., Oct. 6,
2004, at 14.  In fact, since revised Regulation 68 took effect in
April 2002, the Insurance Department has conducted 25 in-depth
investigations into the claims practices of insurers.

### C. The District Court's Remaining Concerns About Construing Section 65-3.16(a)(12) Broadly Are Unfounded.

Asserting that "[t]here are . . . myriad grounds for
challenging the license of a professional service corporation,"
the federal district court worried that if more than a facially
valid license is required for eligibility to receive No-Fault
reimbursement, a health provider would be compelled to document
compliance with innumerable laws in order to prove its right to
payment.  Mallela II, 2002 U.S. Dist LEXIS 25187, at *37.  The
court offered three examples of how a broad construction of
Section 65-3.16(a)(12) could prove onerous to health providers.
However, in the Superintendent's estimation, Section 65-
3.16(a)(12) would not affect a provider's right to reimbursement

in any of those instances, particularly since none of them
involves obtaining the certificate of authority to operate as a
medical PC by fraud in the first instance.

First, the district court posited that an insurer might
"question a [medical PC] about whether all its owners and
physicians have been making their child support payments, because
failure to pay child support in New York triggers the revocation
of professional licenses under Domestic Law § 244-c." Mallela
II, 2002 U.S. Dist. LEXIS 25187, at *37.  However, while an
individual health provider's failure to pay child support could
constitute "professional misconduct" that could lead the DOE or
the Department of Health to suspend or revoke the individual's
license or the medical PC's certificate of incorporation, see
Educ. Law. § 6509-b, 6509(8); Dom. Rel. Law § 244-c, the medical
PC would remain eligible for reimbursement under the No-Fault Law
unless and until the licensing authority actually took such
disciplinary action.  Only at that point would the PC be
ineligible for failing "to meet any applicable New York State or
local licensing requirement necessary to perform such [medical]
service in New York . . . ."  11 N.Y.C.R.R. § 65-3.16(a)(12).

Second, the district court suggested that a medical PC's
failure to hold an annual meeting could be a ground for denying
reimbursement if Section 65-3.16(a)(12) were read to require a
provider to be "lawfully" authorized in every conceivable way to

29

provide and bill for health care services.  Mallela II, 2002 U.S.
Dist. LEXIS 25187, at *37.  But the law requiring a corporation
to hold an annual shareholders' meeting, see BCL 602(b), does not
pertain to the question of whether the medical PC has "lawful"
authority to provide health care services.  The annual meeting
requirement protects the interests of corporate shareholders; it
does not implicate concerns about the corporate practice of
medicine.  For this reason, a medical PC's failure to hold an
annual meeting is not, in the Superintendent's view, a ground for
denying reimbursement under his intended interpretation of
Section 65-3.16(a)(12).

Third, the district court speculated that a "failure to pay
the appropriate license renewal fees" might disqualify a medical
PC from receiving reimbursement under the No-Fault Law.  Mallela
II, 2002 U.S. Dist. LEXIS 25187, at *37.  But again, there is
nothing in New York law to suggest that, in the absence of
disciplinary action taken by a licensing authority, a licensee's
failure to pay renewal fees or adhere to other technical or
administrative requirements has any bearing on the question
whether a provider is "lawfully" authorized to provide and bill
for health care services.[4]

---

[4] Moreover, at common law, a professional's failure to
comply with a licensing statute excused one who had received
services from that professional from payment, but only if the
statutory provision in question was intended to protect "public
health or morals" or to prevent fraud.  Galbreath-Ruffin Corp. v.

In short, allowing an insurer, in certain carefully delineated circumstances and subject to ongoing Insurance Department oversight, to look behind a facially valid license to determine whether a provider is lawfully authorized to provide and bill for medical services under New York law creates no slippery slope.  Where a medical PC plainly violates the core requirements of New York law by procuring facial authorization to practice medicine by fraud in violation of the long-standing prohibition against the corporate practice of medicine, that provider is not eligible under Section 65-3.16(a)(12) for reimbursement under the No-Fault Law.

---

40th and 3rd Corp., 19 N.Y.2d 354, 363-66 (1967).  A licensee's failure to comply with a mere revenue-raising or administrative aspect of a licensing statute, however, would not excuse payment. See id.  Thus, a medical PC's failure to pay renewal fees or adhere to other administrative requirements would not allow insurers to interpret Section 65-3.16(a)(12) to refuse reimbursement under the No-Fault Law.

**CONCLUSION**

For the foregoing reasons, this Court should answer the certified question in the negative and hold that a medical corporation that is fraudulently incorporated under New York law is not entitled to reimbursement under the No-Fault Law and its implementing regulations for medical services rendered by licensed medical practitioners.

Dated:     New York, New York
           November 23, 2004

                          Respectfully submitted,

                          ELIOT SPITZER
                            Attorney General of the
                            State of New York


                   By:    _____
                          Robert H. Easton
                          120 Broadway, 25th Floor
                          New York, New York 10271
                          (212) 416-8311

DANIEL SMIRLOCK
Deputy Solicitor General

ROBERT H. EASTON
Senior Assistant Solicitor General[5]
     of Counsel

---

[5] The Office of the Attorney General acknowledges the invaluable assistance of Richard P. Dearing in the preparation of this brief.